495 So.2d 447 (1986)
HOLMES COUNTY BANK AND TRUST COMPANY, Executor of the Estate of Perry Strickland, Deceased
v.
STAPLE COTTON COOPERATIVE ASSOCIATION.
No. 55879.
Supreme Court of Mississippi.
September 10, 1986.
Rehearing Denied October 29, 1986.
*448 Pat M. Barrett, Jr., Barrett, Barrett, Barrett & Patton, Lexington, for appellant.
Arnold F. Gwin, Greenwood, for appellee.
Before HAWKINS, P.J., and ROBERTSON and GRIFFIN, JJ.
GRIFFIN, Justice, for the Court:
In March, 1984, the plaintiff/appellant Perry Strickland obtained a jury verdict for personal injuries against the defendant/appellee, Staple Cotton Cooperative Association, in the Circuit Court of Leflore County in the sum of $200,000.00.
On appellee's motion for a new trial, the trial court found the damages awarded to be against the great and overwhelming weight of the evidence and so excessive as to be the result of bias, prejudice, and passion. He ordered a remittitur in the sum of $113,400.38, leaving an award of $86,599.62. The plaintiff was required to accept the remittitur or face a new trial. He appeals, and we agree with plaintiff/appellant.
However, before proceeding, it should be pointed out that the plaintiff/appellant died in November, 1984, and that the executor of his estate, Holmes County Bank and Trust Company, is substituted here as appellant.
The facts giving rise to the suit are well stated in the complaint and we recite the second paragraph:
On March 12, 1983, plaintiff was operating his Datsun pickup truck in a northerly direction on Highway 49 just south of Greenwood in Leflore County, Mississippi, in a safe and prudent manner, when suddenly and without warning an oncoming, south-bound, 18-wheel tractor-trailer owned by defendant and operated by its employee, servant and agent Rubert M. Phillips, jackknifed and struck plaintiff's vehicle, knocking it off the highway and causing severe personal injuries to plaintiff as hereinafter more particularly described.
It was not disputed that the operator of the tractor-trailer was acting within the scope of his employment and in furtherance of the business of the defendant/appellee. It was further alleged and supported by evidence that:
4. Said negligent operation of his vehicle by Rubert M. Phillips consisted of his failure to keep said vehicle under reasonable and easy control, his failure to keep a proper lookout ahead, following another vehicle more closely than was reasonable and prudent under the circumstances then and there existing, in violation of Section 63-3-619(1) of the Mississippi Code of 1972 and his operation of said vehicle at a rate of speed which was excessive under the circumstances then and there existing, consisting of heavy vehicular traffic in an area where there were many approaches to and from said Highway 49, to and from business establishments and private residences.
The appellee asked for and received an instruction on contributory negligence; however, it is stated in appellee's brief that it "does not contend that it was entitled to a peremptory instruction on Mr. Strickland's contributory negligence, so the sole issue here is simply whether or not the trial court abused its discretion in holding that, based on the evidence of Mr. Strickland's injuries and damages, the amount of the verdict was so excessive as to be against the weight of the evidence."
The allegations of the complaint were amply supported by the witnesses and the circumstances. Also, there is no dispute concerning the plaintiff's injuries. Therefore, the question here is whether or not the trial court manifestly abused its discretion. Hynum v. Smith, 447 So.2d 1288 (Miss. 1984); Dorris v. Carr, 330 So.2d 872 (Miss. 1976). In deciding this question, we are to consider the record as a whole, and weigh the action of the trial judge according to the facts and circumstances of this case and in others. McNair Transport, Inc. v. Crosby, 375 So.2d 985 (Miss. 1979).
The plaintiff's light pickup was knocked off of the highway and he was taken immediately *449 to a Greenwood hospital and within a few hours removed by ambulance to the Baptist Hospital in Jackson, where he remained for 27 days and was there treated by Dr. Lucien Hodges, a neurosurgeon. The appellee in its brief gives the testimony of Dr. Hodges in part. We do likewise:
His x-rays showed what we call a fracture dislocation of the 4th vertebrae in his neck on the 5th vertebrae; and in simple terms that means that one vertebrae has slipped forward a little bit on the other vertebrae and that it causes his neck to be unstable. Now we later got some what we call tomograms on him, and these showed a fracture through the joint of that level in his neck at the C-4 level. My diagnosis basically was a fracture dislocation of his cervical spine, the 4th on the 5th vertebrae. We felt that most likely the 5th cervical nerve root had some pressure on it because of his pain, and later because of the slight weakness that he had in his arm. This was pretty well relieved by the treatment that we gave him. I felt Mr. Strickland to be a pretty stoic individual. He didn't really complain of a lot of pain. He was, of course, very uncomfortable and he was uncomfortable with the treatment we gave him. But, you know, he had the usual soreness and stiffness in his neck and some coming out into his arm, although pain was never a great factor with him. I felt he was a stoic individual because he didn't complain very much. Sometimes you get a little bit more complaints than what he had.
... .
In my opinion the wreck caused these injuries. The treatment that I gave Mr. Strickland was that we put him at bed rest. For the first couple of days we used a cervical collar on him which restricted any movement of his neck and kept him in bed. Then we instituted what we call skeletal traction, which is putting some tongs in his head and attaching these to a rope and subsequently to some weights to pull on his head and neck. These are similar, although they are a much more refined version of plain old ice tongs that are used to pick up a block of ice. We can screw these things into the head. And with means of a rope, we can pull on his head and keep his neck from moving any or slipping further by putting weights on them. We probably started him out on 15 to 20 lbs., then when we were certain it was stable, we probably reduced it to 10. I don't remember specifically. We kept him in traction 14 days.
... .
The tongs were screwed into Mr. Strickland's skull, probably a millimeter or two. We have found that by screwing them tight they will stay in place. They go into both sides of the skull. There was a little pain connected to the application of the tongs but we deadened the skin where we put them in, so not considerably. During the time we had him in the tongs, we took him out and x-rayed him again. Upon doing it, it showed that the vertebrae had slipped again. For this reason we felt like he ought to be operated on and those vertebrae fused together. This was carried out on the 29th of March, 1983. We did what we call a posterior cervical fusion from the 3rd through 5th vertebrae in his neck. It fused those 3 vertebrae together and this would keep the 4th and 5th one from slipping on each other. In doing this we used rib grafts or what we call a strut to make those bones grow together, and then we held them in place with wires wrapped around the bones. When we got through, we felt like we had what we call a good fusion. In making the cervical fusion, it was necessary to make an incision in the back of his neck about 6 inches long.
... .
The ribs we used to make the strut for the neck came out of his ribcage in the back on the right side, and we had to make a separate incision for this. I think we just used one rib, and we used one piece on either side of the neck, probably 2 1/2 to 3 inches long each. He has a good prognosis with some restrictions. Restriction *450 in movement of the neck is the primary restriction. Fusing his neck caused him to have more difficulty in turning his head from one side to the other or rotating his head around and also bending his head forward and backwards.
... .
In my opinion Mr. Strickland has permanent partial disability of approximately 15% on the basis of his neck stiffness and some discomfort in his neck, because of the limited range of motion and some discomfort that he is going to have with it such as some pain or aching in his neck when the weather turns bad or things like that.
... .
Well, primarily the restriction in the movement of his neck in that we fused the three vertebrae together. He's an elderly man to begin with, [the plaintiff was 73 years of age with a life expectancy of 10.1 years], and his range of motion was already somewhat restricted and us putting him  fusing his neck caused him to have more difficulty in turning his head from one side to the other or rotating his head around and also bending his head forward and backwards.
Mr. Strickland was in traction at the hospital for 14 days and upon his release stayed with relatives for approximately two weeks before returning home, where he lived alone.
At the time of the trial, Mr. Strickland stated that he still suffered pain from time to time and took Tylenol for the pain, had suffered double vision which had been corrected by glasses and no longer existed, and could not do his gardening and other chores without pain or difficulty as he had been able to do prior to the accident. He was retired and was still able to visit his friends at various businesses around his home town of Lexington.
As noted above, the doctor stated that Mr. Strickland was a stoic gentleman and did not complain much of pain. The appellee urges in effect then that the plaintiff did not have "much" pain; however, it has been our experience that plaintiffs who give the impression of concealing pain find a more receptive jury than those who appear to exhibit it.
The trial judge, in arriving at his remittitur, did not "knock anything off of the top, but to the contrary started at the bottom". First, he allowed full medical expense of $9,599.62, allowed $1,000.00 per day during his hospitalization of twenty-seven days or $27,000.00, $1,000.00 per week for convalescence at his sister's home for two weeks, and $400.00 per month for the stipulated life expectancy of ten years or 120 months, $48,000.00, for the total award of $86,599.62.
We have studied several decisions of this Court during recent years in order to compare approved jury verdicts with the verdict here, and the remittitur of the trial court. This is extremely difficult to do. None of the cases are exactly alike; however, it appears that remittiturs of approximately 56% of the jury's award are out of line. We have approved awards in much larger sums than that approved by the trial court where the injuries and expenditures were no greater than that suffered by the plaintiff/appellant here.
In James Reeves Contractor, Inc. v. Chain, 343 So.2d 1229 (Miss. 1977), the plaintiff was allowed to retain $100,000.00 of a $150,000.00 jury verdict. There was a back injury in that case but not of sufficient gravity to require an operation, and a disability of 10%. In L. & N.R.R. Co. v. Hasty, 360 So.2d 925 (Miss. 1978), this Court held $120,000.00 not to be excessive. There we said:
The final assignment of error is that the judgment of $125,000 is excessive. Appellants base this assignment on the fact that the Appellee's medical and hospital bills totaled $10,701.71 and the fact that her fractures were healing properly. On the other hand, as the appellants concede, she had a ten percent permanent partial disability of the spine and a ten percent disability of the lower left extremity and some disability of the right lower extremity. There was also uncontradicted *451 testimony that the appellee had undergone, and was still in, considerable pain and there was evidence that she underwent a personality change as a result of the accident and psychiatric help in the future was indicated. Under the circumstances, we cannot say that the award was excessive.
360 So.2d at 927.
Of course, since 1978 there has been a change in the purchasing power of the dollar and the cost of living. Jurors are allowed to recognize this. Walters v. Gilbert, 158 So.2d 43 (Miss. 1963); Boyd Construction Co. v. Bilbro, 210 So.2d 637 (Miss. 1968); Kinnard v. Martin, 223 So.2d 300, 302 (Miss. 1969).
In Jesco, Inc. v. Shannon, 451 So.2d 694 (Miss. 1984), we stated that the juries can take into account the "impact of inflation and change of the purchasing power of money and cost of living."
It is true that we should not disturb the trial court's finding unless manifestly wrong. Nevertheless, the trial judges are not allowed to disregard the evidence and this Court may reinstate the jury verdict. Schoppe v. Applied Chemicals Div., etc., 418 So.2d 833 (Miss. 1982). It was there pointed out that "awards fixed by juries are not merely advisory and will ordinarily not be set aside except where so unreasonable in amount as to strike mankind at first blush as being beyond all measure, unreasonable, and outrageous."
Mississippi State Highway Comm. v. Antioch Baptist Church, 392 So.2d 512 (Miss. 1981), states that, while the trial judge has considerable discretion in dealing with additurs or remittiturs granted pursuant to Mississippi Code Annotated § 11-1-55 (Supp. 1985), this Court has the responsibility to see that such judicial discretion is exercised soundly and, if not, to reverse.
We must decide whether or not the verdict is so excessive as to "shock the enlightened conscience".
There are some damages, such as medical expenses and loss of income, which must be proved with reasonable certainty, but there are also some damages, such as pain and suffering, that are not susceptible of proof as to monetary value, and these items must be left to the discretion of the jury as long as the amount thereof, under all of the evidence, is just and reasonable.
Grant, Summary of Mississippi Law Sec. 980.1 (Supp. 1984).
Interestingly, Judge L.A. Smith, in Conner v. Hatcher, 203 So.2d 309 (Miss. 1967), reversed Judge Grant when he ordered a remittitur with the following language:
In the case now before us, it is beyond dispute that the collision was the proximate result of negligence on the part of Hatcher in operating his automobile and that Mrs. Conner was wholly free of contributory negligence. Moreover, it is undisputed that, prior to the collision, she was in good health, was a person unusually active in sports and habitually did all of her own house work. Following the accident, she underwent the most excruciating pain for a long period of time, was forced to undergo major surgery, has continued and will continue to experience severe pain, and has suffered a substantial disability. None of this is in dispute. Therefore, although we are reluctant to disturb the action of the trial court in sustaining the motion and in ordering a new trial upon the issue of damages alone, we have reached the conclusion that he was manifestly in error in so doing in the case of Mrs. Conner.
203 So.2d at 313.
Judges cannot sit as jurors, and the question before them is never what they would have done sitting as a juror but whether, considering the evidence in the light most favorable to the non-moving party, together with all reasonable inferences which may be drawn therefrom, the court should disturb the jury verdict. City of Jackson v. Locklar, 431 So.2d 475 (Miss. 1983).
Here, we do not believe that the trial judge properly considered the totality of the evidence before him. Accordingly, *452 we set aside the remittitur and reinstate the jury verdict in the sum of $200,000.00.
REVERSED AND JURY VERDICT REINSTATED.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.