738 So.2d 746 (1998)
GENERAL MOTORS CORPORATION, Appellant,
v.
Jimmy PEGUES, Appellee.
No. 96-CA-01333 COA.
Court of Appeals of Mississippi.
December 8, 1998.
Rehearing Denied February 23, 1999.
Certiorari Denied May 13, 1999.
*748 Andrew N. Alexander, III, Greenville, Attorney for Appellant.
Richard T. Phillips, Batesville, Attorney for Appellee.
Before BRIDGES, C.J., HINKEBEIN, and KING, JJ.
BRIDGES, C.J., for the Court:
¶ 1. Jimmy Pegues, a resident of Panola County, Mississippi, was involved in an automobile accident on April 27, 1986. Pegues argued that a defective ball joint on a 1982 Chevrolet pickup truck broke, causing him to lose control of the vehicle, leave the roadway, and crash into a concrete box culvert resulting in severe disabling injuries, including but not limited to, the amputation of his left leg. General Motors (GM) argued that the ball joint broke only after impact, and that Pegues's drunk driving and speeding was the proximate cause of the accident. The jury returned a unanimous verdict in favor of Pegues for $3,529,600, and the trial court entered its judgment accordingly. GM filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial or a remittitur, all of which the trial court denied. Aggrieved, GM argues on appeal: 1) that they are entitled to judgment because the physical facts disproved Pegues's claim, 2) that the verdict is contrary to the overwhelming weight of the evidence, 3) that Pegues's expert was improperly allowed to testify about matters beyond his competence as an auto mechanic, 4) that Pegues's prejudicial references to irrelevant "side-saddle gas tank litigation" and alleged "problems" with other ball joints required a new trial, and 5) that the damage award was excessive and unsupported by proper evidence. Finding no error to the issues raised, we affirm the judgment entered on the jury's verdict.

FACTS
¶ 2. In 1982, GM sold a Chevrolet pickup truck as a new vehicle to James Scott. In *749 May 1985, Scott sold the pickup to Womble and Prides, an automobile sales and service operation, who in turn, sold it to Pegues's brother, Ezell. On or about April 27, 1996, Pegues borrowed the pickup truck from his brother, and was traveling along Highway 6 in Panola County, Mississippi.[1] Pegues stated that he had been "hanging out" with friends and admitted to drinking beer that evening.[2] After dropping his friends off, Pegues testified that as he was driving home in the right lane, he went down a hill over a "dip" in the road, and approximately a half mile later something caused the pickup to veer left off of the road.[3] Pegues stated that he was able to slow down, return to the road, and regain control of the truck. Pegues testified that since he was approximately two miles from his home, he thought he could get the truck home before anything else occurred. Pegues stated that he sped up and "that's when it was coming off the road again. And while it was coming off the road it was burning my hand when I tried to pull it back on the road, and I was steady fighting it." Pegues stated that he was unable to get the truck back onto the road. He testified, "I was turning back to the right, but it was going to the left." Pegues was unable to regain control of the vehicle, and it crashed into a concrete box culvert. Pegues testified that that was the last thing he remembered until regaining consciousness in the hospital approximately three weeks later. Pegues stated that he suffered catastrophic injuries in the accident, which necessitated extensive hospitalization and fourteen separate surgeries, including the amputation of his left leg. At the time of trial, the cost of medical care for these injuries was $190,424.16.
¶ 3. Pegues argues that the sole proximate cause of the collision and his resulting injuries was the unreasonably dangerous, defective design and manufacture of the front end ball joint assembly by GM. GM argues that the cause of the accident was driver error in that Pegues was driving drunk at nearly 80 mph, and that just before the pickup left the road, he attempted to drive with one hand while fumbling to turn on some lights, and he simply ran off the road. The main issue that was presented to the jury was whether the ball joint broke before the accident or whether the ball joint broke after the impact occurred. Both sides presented expert testimony, and the jury ultimately sided with Pegues and unanimously awarded him damages. GM filed post trial motions which were denied. Aggrieved, GM now appeals.
ARGUMENT AND DISCUSSION OF LAW
I. WHETHER THE VERDICT OF THE JURY WAS UNSUPPORTED BY THE PHYSICAL EVIDENCE.
II. WHETHER THE VERDICT WAS CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 4. Since GM's Issues I and II deal with the sufficiency and weight of the evidence and are essentially two similar standards, we shall discuss them together. GM argues on appeal that incontrovertible physical evidence proved that the ball joint assembly was not defective and that the condition of the pickup truck had nothing to do with the accident. GM contends that the evidence proved that the ball joint assembly broke in the severe accident caused by Pegues's own negligence. Furthermore, GM argues that Pegues's theory *750 of the defect and causation does not fit any of the physical evidence in the case.
¶ 5. Pegues argues that the evidence supported the findings of the jury, that a factory-installed GM front-end ball joint, properly maintained and having only 70,000 miles on it, broke during travel on the highway, causing the wheel to collapse and Pegues to lose control of the pickup. Pegues contends that the main issue of whether the ball joint broke before or after the accident was a question of fact for the jury to decide. We agree.
¶ 6. The standard of review for challenges to the sufficiency of the evidence is well settled in this state. When reviewing the trial court's denial of a motion for judgment notwithstanding the verdict, this Court's scope of review is limited as follows:
Where, as here, the trial judge has refused to grant a motion for JNOV, we examine all of the evidencenot just the evidence which supports the non-movant's casein the light most favorable to the party opposed to the motion. All credible evidence tending to support the non-movant's case and all favorable inferences reasonably drawn therefrom are accepted as true and redound to the benefit of the non-mover. If the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable men could not have arrived at a contrary verdict, the motion should be granted. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the jury verdict should be allowed to stand and the motion denied, and, if it has been so denied, we have no authority to reverse.
C & C Trucking Co. v. Smith, 612 So.2d 1092, 1098 (Miss.1992) (citations omitted). In City of Jackson v. Locklar, 431 So.2d 475, 478-79 (Miss.1983), the court stated:
It is no answer to say that the jury's verdict involved speculation and conjecture.... [A] measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Some guesswork and speculation are necessarily involved in practically all jury verdicts, including those no one would dream of suggesting be disturbed.
. . . .
Our institutional role mandates substantial deference to the jury's findings of fact and to the trial judge's determination whether a jury issue was tendered. When a verdict is challenged via appeal from denial of a motion j.n.o.v., we have before us the same record that the trial judge had. We see the testimony the trial judge heard. We do not, however, observe the manner and demeanor of the witnesses. We do not smell the smoke of battle. (citation omitted). The trial judge's determination whether, under the standards articulated above, a jury issue has been presented, must per force be given great respect here.
¶ 7. In motion for a new trial, the weight of the evidence is challenged. Henson v. Roberts, 679 So.2d 1041, 1045 (Miss.1996).
The grant or denial of a motion for a new trial is and always has been a matter within the sound discretion of the trial judge. The credible evidence must be viewed in the light most favorable to the non-moving party. The credible evidence supporting the claims or defenses of the non-moving party should generally be taken as true. When the evidence is so viewed, the motion should be granted only when upon a review of the entire record the trial judge is left with a firm and definite conviction that the verdict, if allowed to stand, would work a miscarriage of justice. Our authority to reverse is limited to those cases wherein the trial judge has abused his discretion. *751 Moody v. RPM Pizza, Inc., 659 So.2d 877, 881 (Miss.1995).
¶ 8. In the case sub judice, the jury heard all the evidence from the witnesses, not from a transcript. Pegues introduced direct evidence in the form of photographs, videos, physical exhibits, and the testimony of fact witnesses including himself. GM introduced its own witnesses and theory as to why the accident occurred. Pegues's expert argued that the GM ball joint collapsed before the vehicle left the road. GM's expert argued that the damage to the ball joint could only have occurred in a severe accident. However, this was contradicted when GM's own video demonstration showed that when the left ball joint is disengaged, the vehicle will jerk to the left. This particular video involved a 1982 Chevrolet pickup traveling 35 miles per hour on a level test track. As the ball joint was disengaged, the vehicle jerked to the left, and GM's own expert, who had been steering with only his left hand, was forced to grab the wheel with both hands to correct it.[4]
¶ 9. GM argued that Pegues's drinking was the sole proximate cause of the accident. The jury was constantly reminded of this throughout the trial, and as the trial judge appropriately stated:
While many jury verdicts arouse the emotions of the citizens and the media, in analyzing a jury verdict, one has to calmly apply reasoned judgment and the law to the evidence presented. It must be kept in mind that the jury was more than adequately instructed on the liability issues as well as on our contributory/negligence laws. MCA Sec. 11-7-15, enacted by out state legislature in 1910, states: In all actions hereafter brought for personal injuries, or where such injuries have resulted in death, or for injury to property, the fact that the person injured, or the owner of property, or person having control over the property may have been guilty of contributory negligence shall not bar recovery, but damages shall be diminished by the jury in proportion to the amount of negligence attributable to the person injured, or the owner of the property, or the person having control over the property.
¶ 10. When facts are in dispute as they were in this case, the jury is given the power to resolve the factual disputes, and this jury did so in favor of Pegues. Moreover, it was the province of the jury to weigh the credibility of the witnesses. After careful review of the record, it is this Court's opinion that a "reasonable, hypothetical juror" could have returned a verdict as this one did. There is ample evidence supporting the jury's verdict. When the evidence is disputed and different conclusions argued, the Court "has refused to take an issue from the jury or to interfere with a jury's decision." McKinzie v. Coon, 656 So.2d 134, 140 (Miss.1995). This issue is without merit.

III. WHETHER PEGUES'S EXPERT WAS IMPROPERLY ALLOWED TO TESTIFY ABOUT MATTERS BEYOND HIS COMPETENCE AS AN AUTO MECHANIC.
¶ 11. GM argues on appeal that Pegues's expert, Benny Spencer, was improperly allowed to testify about the cause and nature of the accident. Specifically, GM contends that although Spencer was legitimately qualified to testify as to whether the ball joint assembly had been well-maintained and was factory-installed, he was not qualified to testify about whether the castle nut had been tightened to factory specifications during assembly, whether the ball stud was loose before the accident, what caused the ball stud to separate from the socket, whether the left front wheel laid out flat on the road, and whether the ball joint assembly was "unreasonably dangerous". GM contends that only an accident reconstructionist would be qualified to testify as to the above issues, and that Spencer was only admitted as an expert in auto mechanics, not accident reconstruction. *752 Moreover, GM argues that Spencer had no formal education beyond high school to qualify him as an expert.
¶ 12. Pegues argues that not only had Spencer been a professional auto mechanic for forty years, he also had received training by General Motors Corporation, worked as a mechanic at a General Motors dealership, owned his own automotive business for thirty-three years, and had "hands on, professional experience with the front end assembly and ball joints on General Motors vehicles," having worked on 50 to 100 ball joints over the years. Furthermore, Pegues contends that Spencer's opinions were based on his personal examination of the pickup truck, its ball joint, and its front-end assembly.
¶ 13. To be qualified as an expert under the Mississippi Rules of Evidence, Rule 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. (emphasis added).
In addition, Rule 703 states:
The facts or data in the particular case upon which an expert bases an opinion or inferences may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular filed in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
¶ 14. The qualification of an expert witness is left to the sound discretion of the trial judge, and his determination will not be reversed unless it clearly appears that the witness was not qualified. Wilson v. State, 574 So.2d 1324, 1334 (Miss.1990); Smith v. State, 530 So.2d 155, 162 (Miss. 1988).
¶ 15. After careful review of the record, it is this Court's opinion that Spencer was fully qualified to testify as an expert in auto mechanics, and that his testimony did not require him to be qualified as an expert in accident reconstruction. We agree with Pegues that GM's arguments about Spencer's opinions go to credibility, not admissibility. It is important to note that the issue of whether Spencer was qualified to testify as to his opinions was extensively debated by both parties. The court allowed an in-chambers argument where Pegues stated the opinions for which Spencer was being offered, and GM was allowed to state its objections.[5] After the in-chambers discussion, the court then permitted extensive voir dire by both parties, and Spencer was tendered and accepted as an expert in the field of auto mechanics.
¶ 16. It is this Court's opinion that the case at bar is similar to the experts in Ford Motor Co. v. Cockrell, 211 So.2d 833, 838 (Miss.1968), where a mechanic was qualified as an expert and testified about a defect in a truck's electrical system, and in Ford Motor Co. v. Dees, 223 So.2d 638, 641 (Miss.1969), where a part owner and manager of a large automotive repair shop was qualified to testify as an expert on construction and working of a steering mechanism of a pickup truck. In this case, Spencer was qualified as an expert and testified that it was his opinion that the accident occurred because of a defected front-end ball joint that broke as Pegues was driving the vehicle. "An expert's qualifications and the basis of his conclusions are open to cross examination. The jury, as is their province, may reject the expert's testimony as they might any other witness." Hollingsworth v. Bovaird Supply Co., 465 So.2d 311, 314 (Miss.1985). *753 We agree with the remarks in Ford Motor Co. where the supreme court stated, "He did aid the jury with his expert knowledge, but he did not invade the province of the jury and furnish them with the ultimate answer." Ford Motor Co., 223 So.2d at 641.
¶ 17. In the case sub judice, GM seemed to argue that its expert was better qualified to offer an opinion as to causation, and therefore, it was automatically entitled to both weight and credibility. That is not the law.
The jury is the sole judge of the credibility of the witnesses and the weight and worth to be given their testimony. They are not required to accept all of a witness' testimony as true but may accept some parts and reject others, accept it all or reject it all, as they see fit.
Carter v. State, 310 So.2d 271, 272 (Miss. 1975). Thus, the jury is not required to believe any witness, not even an expert. The jury obviously placed greater credibility on Pegues's expert as opposed to GM's expert. "When the evidence is conflicting, we defer to the jury's determination of the credibility of witnesses and the weight of their testimony." Ducker v. Moore, 680 So.2d 808, 811 (Miss.1996). Accordingly, the trial court did not abuse its discretion in allowing Spencer to testify as an expert in the field of automotive mechanics. This issue is without merit.

IV. WHETHER THE APPELLEE'S REFERENCES TO "SIDE-SADDLE GAS TANK LITIGATION" AND OTHER ALLEGED BALL JOINT PROBLEMS CONSTITUTED REVERSIBLE ERROR REQUIRING A NEW TRIAL.
¶ 18. GM argues on appeal that since Pegues had no proof that a defect in the ball joint caused the accident, they injected prejudicial statements about other "sidesaddle gas tank litigation" and other alleged problems involving ball joints. GM contends this constituted reversible error, and that a new trial is required. Pegues argues that their statements were appropriate for purposes of impeachment or were GM's own inflammatory remarks. Upon review of the record, it appears that there are five separate instances where GM argues that prejudicial statements were made during the course of the trial: during voir dire, twice during opening argument, during cross-examination of GM's expert, and during cross-examination of GM's representative. Each statement will be discussed separately and then considered cumulatively.
¶ 19. Since GM failed to properly preserve a full record by excluding voir dire, this Court has been left no tools to consider the merit of their first contention. "This Court may not act upon or consider matters which do not appear in the record and must confine itself to what actually does appear in the record." Fuselier, 654 So.2d at 521 (Miss.1995) (citations omitted). The fact that both parties mention the instance in their briefs and that an in-chamber proceeding discussed which jurors would be removed for cause is insufficient. Accordingly, any objections to statements made during voir dire are waived for failure to designate a necessary part of the record.
¶ 20. GM next contends that Pegues's opening argument contained repeated prejudicial statements "referring to other accidents, complaints, actions, injuries and even deaths supposedly caused by problems with GM ball joints." GM asked to approach the bench; however, since GM also failed to properly preserve the bench conferences in their record on appeal, this Court is left to its imagination as to what was said by the parties and the trial judge. Since Pegues continued with his argument, the objection was likely overruled. GM objected again when Pegues brought up their interrogatories. The court sustained GM's objection as to Pegues's last comment. However, GM failed to request for the trial court to admonish the jury to disregard counsel's remarks. As stated in *754 Johnson v. State, 477 So.2d 196, 209-10 (Miss.1985):
[C]ounsel should be given wide latitude in their arguments to a jury. This is inherent in, and indispensable to, our adversary system. Courts should be very careful in limiting the free play of ideas, imagery and the personalities of counsel in their argument to a jury. [It] is the duty of a trial counsel, if he deems opposing counsel overstepping the wide range of authorized argument, to promptly make objections and insist upon a ruling by the trial court. The trial judge first determines if the objection should be sustained or overruled. If the argument is improper, and the objection is sustained, it is the further duty of trial counsel to move for a mistrial. The circuit judge is in the best position to weigh the consequences of the objectionable argument, and unless serious and irreparable damage has been done, admonish the jury then and there to disregard the improper comment. (citations omitted).
The supreme court has stated on a number of occasions that where an objection is sustained and "no request is made that the jury be told to disregard the objectionable matter, there is no error." Marks v. State, 532 So.2d 976, 981 (Miss.1988).
¶ 21. GM argues next that Pegues was allowed to improperly cross-examine Peter Rogulsky, GM's expert. GM contends that Pegues made prejudicial statements regarding the subject of side-saddle gas tanks. Pegues contends that when Rogulsky testified that GM had never defended products that were defective, he sought to impeach him with specific legitimate impeachment questions. Pegues argues that any inflammatory remarks were made by GM's counsel when the subject of "side-saddle gas tanks" were brought up on re-direct examination. The first time GM objected, the trial sustained the objection. The jury was directed to disregard it, and there is a presumption that the jury followed the court's instruction. Odom v. Roberts, 606 So.2d 114, 117 (Miss.1992). Thus, the trial court's actions dissipated any taint of prejudice to GM. Several questions later when Pegues attempted to impeach Rogulsky, Pegues asked the court if he could inquire into specific cases regarding the side-saddle gas tank cases. GM asked to approach the bench, and the court overruled GM's objection and motion for mistrial. In Cody v. State, 167 Miss. 150, 148 So. 627, 632 (1933), the supreme court stated, "A wide latitude is allowed on cross-examination to show bias or motives for the purpose of affecting the credibility.... [W]hen it comes to bias, friendship, motive, or hostility, a witness may be cross-examined as affecting his or her credibility as a witness."
¶ 22. GM also argues that Pegues made prejudicial remarks in the cross-examination of William 0. Craig, GM's representative, when Craig was asked about certain interrogatories. The trial court stated that since the interrogatories were propounded and answered by GM, the objection was overruled. It is this Court's opinion that as GM's designated representative, GM consented to Craig testifying on its behalf as to matters known or reasonably available to GM. See M.R.C.P. Rule 30(b)(6).
¶ 23. After carefully reviewing the entire argument by GM and Pegues, we find no reversible error for any statement made by Pegues. Any error that may have occurred was not so extensive or prejudicial as to constitute fundamental error. GM received a fair trialalbeit not a perfect one. See Parmes v. Illinois Central Gulf R.R., 440 So.2d 261, 268 (Miss.1983). Accordingly, this issue is without merit.

V. WHETHER THE DAMAGE AWARD WAS EXCESSIVE AND UNSUPPORTED BY THE EVIDENCE.
¶ 24. GM argues on appeal that the damages in this case were excessive and one of the largest in Mississippi's history. Specifically, GM contends that Pegues's liability theory was demonstrably impossible, he *755 admitted to being negligent as a matter of law since he was driving drunk, and since his quantifiable damages were less than $200,000, the jury's award reflected bias, prejudice or passion and was contrary to the weight of the evidence. Pegues contends that the amount of the jury's verdict was fully supported by the evidence. Furthermore, Pegues contends that GM conceded to the massive nature of his injuries, and that GM did not address the amount of damages until post trial motions. In denying GM's motion for judgment notwithstanding the verdict, or in the alternative, a new trial or remittitur, the trial judge cited McIntosh v. Deas, 501 So.2d 367, 369 (Miss.1987), where the supreme court stated:
As the appellant has pointed out, this Court has approved jury verdicts of similar disparity to the actual damages. Woods v. Nichols, 416 So.2d 659 (Miss. 1982) gives an extensive discussion of prior cases where large verdicts were approved. In Woods, where the plaintiff UPS driver was severely injured in a traffic accident, the Court affirmed a $550,000.00 verdict against approximately $53,000.00 in actual damages. The majority opinion stated, "Some of the elements that may be considered by the jury ... include: the degree of physical injury, mental and physical pain, present and future, temporary and permanent disability, medical expenses, loss of wages and wage-earning capacity, sex, age and plaintiff's state of health...." Id. at 671.
The case at hand bears a striking resemblance to Holmes County Bank & Trust v. Staple Cotton Co-op., 495 So.2d 447 (Miss.1986). In that case, the plaintiff, who was also retired, received an award of $200,000.00 for injuries suffered as the result of a truck/tractor-trailer accident. The trial court ordered a remittitur of $113,400.39, leaving the plaintiff only $86,599.62. Justice Griffin, writing for the Court, reversed the trial court's order of a remittitur, holding that:
"Judges cannot sit as jurors, and the question before them is never what they would have done sitting as a juror but whether, considering the evidence in the light most favorable to the non-moving party, together with all reasonable inferences which may be drawn therefrom, the court should disturb the jury verdict." Id. at 451.
¶ 25. When considering a jury's award of damages on appeal, we are to determine whether or not there is substantial evidence to support the jury award, or whether or not the award is so large as to "shock the conscience" of the Court, or is the result of the jury's bias, passion, or prejudice. Odom, 606 So.2d at 118. The Mississippi Supreme Court has stated:
Once the jury has returned a verdict in a civil case, we are not at liberty to direct that judgment be entered contrary to that verdict short of conclusion on our part that, given the evidence as a whole, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could have found as the jury found.
Bell v. City of Bay St. Louis, 467 So.2d 657, 660 (Miss.1985). The jury's verdict in a civil case is a finding of fact. Edwards v. Ellis, 478 So.2d 282, 289 (Miss.1985). Thus, as stated above, even if we think the amount awarded in the verdict is liberal, we are not allowed to supplant our judgment for that of the jury unless we conclude that there was insufficient evidence to support the award of damages or that the verdict was the product of bias, passion, or prejudice. South Central Bell Telephone Co., Inc. v. Parker, 491 So.2d 212, 217 (Miss.1986).
¶ 26. We begin our analysis on this issue with the basic rule that Pegues, the injured party, had the burden of going forward with sufficient evidence to prove his damages by a preponderance of the evidence. TXG Intrastate Pipeline Co. v. Grossnickle, 716 So.2d 991, 1016 (Miss. 1997); Boling v. A-1 Detective & Patrol Serv., Inc., 659 So.2d 586, 590 (Miss.1995). *756 We are required to view the evidence in a light most favorable to the jury's verdict, giving Pegues the benefit of all favorable inferences that may reasonably be drawn. Odom, 606 So.2d at 118. In addition, "[t]here are some damages, such as medical expenses and loss of income, which must be proved with reasonable certainty, but there are also some damages, such as pain and suffering, that are not susceptible of proof as to monetary value, and these items must be left to the discretion of the jury as long as the amount thereof, under all of the evidence, is just and reasonable." Holmes County Bank & Trust Co., 495 So.2d at 451 (quoting GRANT, SUMMARY OF MISSISSIPPI LAW, Sec. 980.1 (Supp.1984)).
¶ 27. It is undisputed that Pegues's injuries required extensive hospitalization, fourteen operations, and the complete amputation of his left leg, which totaled $190,424.16 in medical expenses. Pegues has suffered a substantial disability of a permanent nature which will require additional surgeries. Pegues testified extensively in regard to his pain following the accident. Pegues stated that the most painful of the surgeries was the skin graft. Dr. Russell testified that Pegues was suffering from malnutrition because his body was unable to generate enough calories to supply his body and fight off the infection in his leg, thus causing the eventual amputation of his leg. Pegues lost 86 pounds because of the injury and was given 60 pints of blood throughout his stay in the hospital. Pegues has been through five artificial legs, and currently is without any sort of prosthesis, as he requires additional surgery for internal injuries.
¶ 28. At the scene of the accident, Buddy Hawkins testified that he found Pegues conscious and obviously in pain, lying in the mud with a bone sticking out of his leg. Pegues was eventually transported to Memphis Regional Medical Center's Trauma Unit where he was diagnosed with multiple orthopedic injuries including dislocation of the pelvis, right hip and left ankle, and multiple fractures of the femur, tibia, and ankle bone. Dr. Thomas A. Russell's deposition stated that Pegues had large wounds between the base of his scrotum to his anus and over his left leg. Pegues was paralyzed upon arrival to the hospital and underwent the first of fourteen surgeries. According to Pegues, the surgeries he has undergone thus far are as follows:
1. April 27, 1986surgical debridement and irrigation of the wounds; stabilization of the tibia and fibula fractures by two external fixators being drilled into the bones; stabilization of the ankle fracture by drilling steel pins into the ankle.
2. April 27, 1986colostomy operation on his abdomen to prevent infection of the wound between the scrotum and anus by feces.
3. April 28, 1986manual manipulation of his foot and surgical placement of steel pins in his foot to stabilize the fractures and dislocations in his left foot.
4. April 29, 1986surgical debridement and irrigation of the wounds.
5. May 2, 1986surgical debridement and irrigation of the wounds; adjustment of the external fixator for better alignment of the fractured tibia.
6. Transplant surgerymuscle removed from shoulder or back area and transplanted into left leg to reconstruct leg.
7. May 15, 1986surgical adjustment of external fixators to prevent continued slipping at the fracture sites.
8. May 21, 1986skin graft transplant surgery from right leg to left leg.
9. May 29, 1986surgical debridement, irrigation, and implementation of a drain at the site of the leg wound.
10. June 5, 1986exploratory surgery -infection discovered running *757 from lower leg into left foot and ankle area.
11. June 17, 1986mid-thigh amputation of left leg.
12. June 21, 1986surgical debridement and irrigation of wound.
13. June 24, 1986amputation wound surgically closed.
14. August 7, 1986colostomy surgically closed.
¶ 29. Pegues was 26 years old at the time of the accident, and was given a 42 year remaining life expectancy. Pegues testified that after he returned home from the hospital, it took him a least a year before he was able to get up out of bed and get around. Pegues stated that when he finally learned to use his prosthesis, he attempted to return to work stripping, waxing, and buffing floors. However, because of the slippery floors, Pegues fell and broke his artificial leg, and was unable to continue to work at that job. Because of the accident, Pegues has suffered and will continue to suffer loss of earnings and loss of earning capacity.
¶ 30. This Court is well aware that each suit for personal injury must be decided by the facts shown in that particular case. Kinnard v. Martin, 223 So.2d 300, 303 (Miss.1969). The record indicates that as a result of his injuries, Pegues has suffered significant constant and sustained pain. The record also reflects that this constant and sustained pain will continue. The loss of his leg has effectively robbed him of a his vocation and has left him disfigured and crippled. He is permanently disabled, incapable of participating in normal activities, and his life is grossly affected in all aspects. The pain and difficulty of having to wear a false leg encompasses extreme hardship in his daily life, twenty-four hours a day, everyday, and will continue until death. See Deas v. Andrews, 411 So.2d 1286 (Miss.1982).
¶ 31. This Court is well aware that Pegues admitted to drinking on the evening of the accident, and that his blood alcohol content registered at .226. However, as we stated earlier, the jury was constantly reminded of this throughout the trial. We agree with the trial judge that "the jury was more than adequately instructed on the liability issues as well as on our contributory negligence/comparative negligence laws." Miss.Code Ann. (1972) Sec. 11-7-15 states:
In all actions hereafter brought for personal injuries, or where such injuries have resulted in death, or for injury to property, the fact that the person injured, or the owner of the property, or person having control over the property may have been guilty of contributory negligence shall not bar a recovery, but damages shall be diminished by the jury in proportion to the amount of negligence attributable to the person injured, or the owner of the property, or the person having control over the property. (emphasis added).
In addition, Miss.Code Ann. (1972) Sec. 11-7-17 states, "All questions of negligence and contributory negligence shall be for the jury to determine." This Court emphasizes that like the trial judge, we do not condone drunk driving; however, the legislature has determined that it is not an absolute bar to recovery and is an issue for the jury to weigh and decide. Based on the evidence, we cannot say that the verdict was excessive, certainly not so grossly excessive as to evince bias, passion or prejudice on the part of the jury in returning it or shock the enlightened conscience. See Toyota Motor Corp. v. McLaurin, 642 So.2d 351 (Miss.1994).
¶ 32. In a case such as this, the search for truth focused on a battle of the experts, each armed with a particular view of the parties' conflicting theories as to how this accident occurred. After hearing all the testimony, the jury, as the ultimate finder of fact, rendered a verdict in favor of Pegues. Considering the serious and permanent nature of the injuries Pegues sustained, the damages awarded do not shock the conscience of this Court. As *758 with any lengthy trial, it was not a perfect trial; however, it was a fair trial. Accordingly, we find no basis to disturb the jury's verdict and the ensuing judgment.
¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF PANOLA COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANT.
THOMAS, P.J., COLEMAN, DIAZ, KING, and PAYNE, JJ., concur.
SOUTHWICK, J., dissents with separate written opinion joined by McMILLIN, P.J., and HINKEBEIN, J.
HERRING, J., not participating.
SOUTHWICK, J., dissenting.
¶ 34. With respect for the view of the majority and for the actions of the trial court, I dissent to the affirming of this award of damages. In my view, there was no proof upon which the jury could rely that any negligence by the defendant contributed to the accident. What caused this one-car accident had to be explained by evidence. The only evidence was that the plaintiff was significantly intoxicated. General Motors's role on the other hand was discussed only through conjecture unsupported by physical verification. The conjecture did not even give a plausible explanation. The accident was tragic for the plaintiff, but that is an inadequate basis on which to excuse the absence of proof. I would reverse and enter judgment here.
¶ 35. Pegues's sole theory regarding a defect in the pickup truck was that a nut was not properly tightened at the factory. Pegues initially argued that the defect caused the wheel to fall outwards, but then agreed it might have fallen in. The vehicle was manufactured in 1982, purchased by Pegues's brother in 1985 from a used vehicle dealer, and driven by Pegues in 1986 when the accident occurred. The loosening of the nut over the four years since the truck's manufacture was the essential element to prove General Motors's responsibility. As will be explained, it is because I find that no proof was ever introduced that the nut had come loose that we should reverse.
¶ 36. In sum, the physical evidence does not support Pegues's theories. The evidence may be somewhat technical, but liability should not arise from the difficulty of jurors' sorting through it.
¶ 37. The accident chronology has been explained by the majority, but I will summarize it here. After drinking six or seven beers in Batesville, Pegues left at 3:00 a.m. to drive east along Highway 6. His blood-alcohol level after the accident was found to be around .24, with legal intoxication being established with a level of .10. Slowing down at one stage because of knowledge of the location that highway patrolmen sometimes wait for speeders, Pegues had trouble determining what speed he was going because the speedometer light was off or dim. Soon after he passed the area that had worried him, he recalled that the truck just went off the road. Pegues testified that the sensation was as if something came up "from behind and just picked the truck up," but he was able to get the truck back on the road. Since he was within two miles of his home, he thought "maybe I could make it to the house before [the problem worsened], and I speeded up then. When I speeded up that's when it came off the road again." Pegues thought he was driving at a speed up to 80 miles per hour when he went off the road into the median a second time. He was unable to return to the pavement, slid clockwise and crashed into a concrete culvert that extended beneath a paved cross-over in the median.
¶ 38. The court instructed the jury that Pegues was negligent because of his extreme intoxication, but that General Motors's possible negligence was something for them to consider under comparative negligence rules. Neither party asked that the jury be given a verdict form that would require a notation of what the total *759 damages were and what percentage of negligence was assigned to each party. Instead, the jury was to make those calculations and return only a general verdict. That verdict was for $3,529,000. Whether that was reached by assigning 99% of the responsibility to General Motors or only 1% cannot be determined. Among General Motors's arguments is that the verdict is grossly excessive. Such an appellate issue is incredibly complicated by this kind of verdict. What in essence General Motors asks is that we evaluate all the permissible total damage awards and permissible comparative negligence percentages, and determine that no combination resulting in a $3,529,000 judgment can be upheld. Had negligence on the part of General Motors been proven, the size of the award and allocation of negligence between the parties would, within a broad range, be for the jury. Probably each side determined that it was in its best interest not to have a different verdict form, but that is a disservice to a reviewing court. I find error elsewhere.
¶ 39. Obviously, the mere occurrence of a vehicular accident does not mean that there was a defect in the vehicle for which the manufacturer was responsible. Plausible explanations for this accident arise immediately from the stated facts without there being any defect in the truck. A few days after the accident Pegues's attorney had a mechanic disassemble the front left wheel assembly. That mechanic was the only person who testified as an expert at trial who believed that there was a defect. General Motors objected to his qualifications as an expert in accident reconstruction and to the factual basis for his opinion. The objections were well-taken.
¶ 40. The admission of expert testimony is left to the sound discretion of the trial judge. Miller By Miller v. Stiglet, Inc., 523 So.2d 55, 59-60 (Miss.1988). Such deference at a minimum requires that we determine whether the proffered expert had the qualifications to state an opinion useful for the jury. It is critical to focus on what kind of opinion the expert is stating. A person qualified to give an expert opinion on the means to repair a wrecked vehicle is not necessarily an expert on why a wreck occurred.

1. The expert testimony
¶ 41. Benny Spencer was the mechanic who at the request of Pegues's attorney disassembled the front wheel a few days after the accident. Spencer has worked as an automobile mechanic for almost his entire adult life. During those nearly 30 years he has had some experience with what he describes as the culprit in the accident, a GM ball joint. He received limited GM training while working for a dealership that sold Chevrolet and Oldsmobile cars, although his training took place decades ago and was wholly unrelated to the mechanism in question. This is the extent of his "knowledge, skill, experience, training, or education" as required by Rule of Evidence 702. He had never prior to this tried to reconstruct the cause of an accident based on examining damage to a vehicle. Spencer himself admitted his lack of experience for the role Pegues's counsel asked him to fill:
Q. Now, what training, if any have you had in determining how impacts like that or otherwise affect the various component parts of the automobile?
A. No training.
Q. Now once Mr. Phillips pointed you to the part he wanted you to take off, was that a part you have ever had any experience at all in trying to determine collision damage and the effects of collision damage to?
A. No.
¶ 42. With these limitations, Spencer testified as to four factors that in his view proved GM's negligence. Since different components of the front wheel assembly are discussed, I attach an exhibit used at trial that depict the parts.
¶ 43. 1. A castle nut had not been tightened four years and 70,000 miles earlier at *760 the factory. That was the entire basis for his conclusion that the vehicle was unreasonably dangerous. The rest of the testimony explained the evidence supporting the loose nut theory. Spencer answered plaintiff's attorney's question as to the reason for his suspicion about the nut by saying that when he took the wheel apart he could unscrew the relevant nut with his fingers. On cross-examination, however, he acknowledged that since what the nut tightened against had been wrenched away during the accident, it was not that surprising that it was loose. He gave no meaningful explanation as to how, considering his expertise, he could distinguish whether the nut was loose before the remainder of the assembly had been bent and torn away, or only loose afterwards.
¶ 44. On the other hand, General Motors's experts testified that the evidence that the nut was tight arises from the fact that the nut had to be installed tightly to be above a hole through which a cotter pin was placed that kept the nut from loosening. If the nut had been loose, GM's experts testified that the top of the cotter pin would have been worn by the rubbing of the nut, but there was no such wear. Further, a loose nut would have worn the threads at the bottom of the bolt, called a "ball stud," on which it was tightened. That wear also did not occur.
¶ 45. Therefore, the indispensable requirement of Pegues's theory of negligencea nut not properly tightened four years earlier at the factorycannot be supported by the expert's first basis for an opinion. Spencer conceded that being able to loosen the nut with his fingers after the accident did not prove that it must have been loose before. Since the pieces of the assembly no longer were together, the necessary tension to keep the mechanism tight was removed. As Spencer said, after the damage to the vehicle from the accident the nut "couldn't have been anything but loose."
¶ 46. 2. The next piece of evidence Spencer relied upon was that the hole through which the ball stud extended was deformed. The nut was tightened onto a ball stud, which in turn passed through a hole in a larger metal piece called a steering knuckle. Pegues's expert found that the hole seemed enlarged, which he was allowed to explain as an expert to be evidence of long-term improper movement of the ball stud. The parties agree that the hole was no longer properly round after the accident, but the difference of opinion is whether the accident caused the deformity. Throughout his testimony, Spencer went well beyond the expertise of a person who repairs automobiles.
Q. How's this ball stud get bent?
A. Moving all the time, through the years, being loose, waddling in the hole. If it had of bent in the accident, it would have cracks on the back side of it. If you bend a piece of steel it will crack on the other side.
Q. Mr. Spencer, are you a metallurgist?
A. No.
Q. What do you know about the tensile strength of this steel?
A. Not anything.
Q.... Well you're saying now [the ball stud] would have been bent, but this you say is moving so it wears out the steering knuckle?
A. Correct.
. . .
Q. Well, now, to be fair, it's worn out in only one direction, isn't it?
A. Right.
. . .
Q. If this thing is loose, you say its waddling around, right?
A. Back and forth.
Q. Back and forth. What about side to side?
A. No.
Q. Why not?
A. The weight of the truck.
Q. Say it again.

*761 A. The weight of the truck is not going sideways; its back and forth.
Q. Back and forth, okay.
A. Putting on brakes, taking off.
Q. Accelerating, turning, what happens then? What happens when you turn? It'll go side to side, too; don't it?
A. Well, you might get a little bit, but not as much as the weight of the pickup going from front to back.
. . .
Q. Now, if this thing were actually waddling, as you say, we'd have deformation this way, wouldn't we? We'd have deformation on both sides, more than likely?
A. It would depend on which way the most weight of the truck is on, moving. Now, that would be my opinion. I don't know about yours.
¶ 47. The necessary basis for this testimony is that Spencer had the expertise to know what a piece of metal looks like if it is bent suddenly as opposed to over time, to calibrate how much and what direction wear would be in a hole, to differentiate the wear caused by the movement of the rod back and forth based on driving forwards compared to wear from turning, and in other respects to interpret the messages given by the deformed hole and reach conclusions. There was no evidence that Spencer was qualified to state such opinions, though he no doubt was qualified to state what would be involved in repairing the damage that he just described.
¶ 48. 3. The next part of the assembly, the upper control arm, was worn thin from the improper movement of the ball stud. Spencer testified that the ball stud (the rod that allegedly had too much freedom of movement because of a loose nut) wore the metal of the upper control arm, the top part of the entire relevant assembly, so thin that the rod just snapped out. He admitted that he did not know what thickness the metal should have been. Thus the only credible evidence on that came from General Motors, whose expert measured the metal's thickness with calipers and found it to be uniform and of the original thickness as specified during manufacture of the piece.
¶ 49. 4. Finally, Spencer testified as to what happened because of this defect that caused Pegues to lose control of the vehicle. First he testified that because Pegues hit a bump on the road, the overly loose rod in a worn assembly pulled out. The wheel then would have fallen flat and the truck went out of control. General Motors had prior to trial conducted a test to determine what would happen if the assembly came apart as Pegues's theory required. Instead of falling out and flat, the tire actually fell into the vehicle. Pegues argued that the test was done at too slow a speed, 35 miles per hour instead of the 80 miles per hour that Pegues was driving. Absent any expert testimony showing the effect of the different speed, however, such jury argument is not credible evidence that the laws of physics applying to this wheel assembly would be affected by speed. Conducting the experiment on a test track, with the safety of the driver at stake, the slower speed was certainly understandable. Indeed, Pegues testified that he was able to continue driving after the first time that he ran off the road. That hardly supports the theory that one tire was lying flat on the pavement. The only usable evidence was that the wheel would have fallen in.
¶ 50. Pegues's attorney then argued that even if the wheel fell in, that did not destroy his theory of the accident. Because the test driver was going much more slowly than Pegues, the fact that GM's driver could still control the vehicle did not mean that Pegues would have been able to control it under the conditions that he faced. That may be, but it also dramatically raises the probability that even if every other part of Pegues's theory of the accident were trueand as just reviewed here the evidence does not support the other elementsPegues's .24 blood-alcohol level was likely an even greater contributor *762 to the accident than would have been the case if there had been a catastrophic collapse of the tire flat on the road.

2. Legal principles
¶ 51. The unfortunate frequency of automobile accidents has led to several instructive precedents for this case. In one, a jury verdict for the plaintiff was reversed because a witness was improperly qualified as an expert in accident reconstruction.
Barber's education and qualifications reveal that he has technical or specialized knowledge of automobile body damage and automobile damage costs, but his qualifications do not reveal any specialized knowledge that would allow him to reconstruct the events of a collision as an expert under Rule 702. While Barber could qualify as an expert to automobile damage and repair and as to cost of repair, Barber does not meet the qualifications regarding accident reconstruction pursuant to Miller and Hollingsworth [v. Bovaird Supply Co., 465 So.2d 311 (Miss.1985)]. Barber does not have the training or experience to qualify him as an expert accident reconstructionist. Indeed, from reading his testimony, it is entirely possible that most, if not all of his testimony was to automobile damage repair and related costs as opposed to the technical, difficult, and scientific reconstruction of collision occurrences and automobile responses. The circuit court erred in allowing such testimony.
Poirrier v. Degrande, 604 So.2d 268, 270 (Miss.1992).
¶ 52. The same defect in qualifications exists here. Spencer does not have the education and experience of anyone who has been allowed to reconstruct the cause of an accident. For example, in one case upon which Pegues relies, the challenged expert had graduated from the Traffic Institute Accident Investigation School of Northwestern University and had extensive experience at Ford, GM, and Chrysler proving grounds as well as in the in the field as a police investigator. Hollingsworth v. Bovaird Supply Co., 465 So.2d 311, 313 (Miss.1985). In another precedent cited by Pegues, a similarly trained expert had twelve years experience investigating between 400 and 600 accidents. Miller v. Stiglet, 523 So.2d at 57. See also, Couch v. City of D'Iberville, 656 So.2d 146, 152 (Miss.1995) ("vast experience in police department investigation and the reconstruction of traffic accidents").
¶ 53. A few cases relied upon by the majority permit expert testimony from witnesses with backgrounds similar to Spencer's. However, the question is not what general qualifications are necessary to be considered an expert, but what is that expert allowed to opine. In one case, the starter on a four month old vehicle without warning "became engaged, causing the motor to turn and the truck to move forward, pinning the plaintiff against the rear of a parked car" and causing severe injuries. Ford Motor Co. v. Cockrell, 211 So.2d 833, 834 (Miss.1968). A mechanic with 35 years of experience, being asked to assume as facts the entire if short repair and maintenance history of this vehicle, was asked whether what occurred was likely a manufacturing defect. The supreme court permitted his answer. Id. at 839. Similarly, another long-term owner of an automobile repair shop was allowed to testify "on the construction and working of the steering mechanism of a pickup truck and also the manner in which the cab was bolted to the chassis." Ford Motor Co. v. Dees, 223 So.2d 638, 641 (Miss. 1969). There is no indication that the expert testified based on the physical evidence to explain the cause of the accident. Indeed, the court pointed out that each "juror could see for himself what happened" from examining the pictures and pieces of the wreckage that were introduced into evidence. Id. at 640.
¶ 54. For a mechanic to testify, based on examining the wreckage, as to what caused the accident is to go well beyond what mechanics by experience and training are *763 qualified to state. Spencer's hypothesis is the sole evidence that Pegues presented on the issue of causation. I find his qualifications inadequate to permit the testimony, and his actual testimony to be inconsistent with the physical evidence. We should reverse and render.
McMILLIN, P.J., and HINKEBEIN, J., join this separate opinion.
NOTES
[1] Highway 6 is a four-lane paved highway with two east bound lanes and two west bound lanes separated by a grassy median.
[2] Pegues admitted to drinking approximately six or seven beers, and according to emergency room treatment records, his lab reports indicated a blood alcohol level of .226.
[3] Pegues contended that as he was driving, the front left ball joint assembly on the pickup broke causing it to suddenly veer to the left, and causing him to lose control of the vehicle.
[4] This video was viewed by the jury as well as by this Court in oral arguments.
[5] Although GM's argument on appeal is whether or not Spencer was qualified as an expert, the record submitted to this Court failed to include the in-chamber argument, and even though Pegues included it in his Supplemental Record Excerpts, this Court may not act upon it or consider it. See M.R.A.P. 10; Fuselier v. State, 654 So.2d 519, 521 (Miss.1995).