RUSSELL, J., for the Court:
¶ 1. Gold Strike Casino Resort (Gold Strike) appeals the Tunica County Circuit Court’s order denying its motion for a new trial or, in the alternative, a remittitur. Gold Strike asserts that a new trial should have been granted because two jurors failed to respond to certain voir dire questions. In the alternative, Gold Strike argues that the circuit court erred in failing to grant a remittitur. Upon review, we find no error and affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. On January 1, 2007, Fendley Cush-ing and her family visited the Gold Strike Casino. During their visit, Cushing slipped and fell on some water on the floor of a buffet room, breaking her right elbow. As a result of her fall, Cushing incurred medical expenses of $6,708 and lost wages of $6,926.07, for a total of $13,634.07 in actual damages. On July 21, 2009, Cush-ing filed suit against Gold Strike on premises-liability theories. On March 14 and 15, 2011, a trial was held, and the jury returned a $250,000 verdict for Cushing.
113. After the trial, on March 25, 2011, Gold Strike filed a motion for a new trial, or in the alternative, a remittitur. Gold Strike argued that: (1) a new trial was warranted because two jurors failed to disclose that they had previously worked for Gold Strike; and (2) a remittitur was warranted because the jury’s verdict was the product of the jury’s bias, prejudice, and passion.
¶ 4. Gold Strike filed a motion for a new trial after learning jurors were its former employees and had failed to disclose this fact during voir dire. Thus, Gold Strike argued that these two jurors would have been disqualified from the jury because had they disclosed such information, the circuit court would have struck them from the jury just as it struck all other Gold Strike employees for cause.
¶ 5. The employment records obtained by Gold Strike after the trial revealed that Juror 4 was a former Gold Strike security officer, employed by Gold Strike from February 20, 2006, to October 4, 2006. Juror 4 worked in the same department as witnesses Ray Trudeau[1] and Mary Young,[2] who were both security officers at Gold Strike at the time of Cushing’s fall. Juror 4’s personnel records indicated that she resigned in order to work elsewhere with her husband.
¶ 6. The employment records of Juror 11 revealed that he was a former bus boy at Gold Strike’s Atrium Café, which is located near the buffet where Cushing fell. Juror 11 was employed by Gold Strike from February 20, 2003, to September 19, 2006, in the same department as the former buffet manager and Gold Strike witness, Harold Wolfe.[3] According to Juror ll’s personnel file, he arrived late for his shift on January 6, 2006. Upon arrival, Juror 11 attempted to unilaterally change the Atrium Cafe’s floor plan to avoid working with, and busing tables for, a particular waitress. Juror ll’s supervisor confronted him about being *983 late to work and told him that he was not authorized to change waitresses. Juror 11 ultimately walked out on his shift and was placed on suspension without pay pending an investigation. While on suspension, Juror 11 resigned. According to his resignation letter, he “dot [sic] like work in the resturat [sic].”
¶ 7. Then, in May 2011, Gold Strike suspected that Juror 11 was related to a decedent (decedent) who was the subject of a wrongful-death suit filed against Gold Strike shortly after the trial of this case. On May 9, 2011, a hearing was held on Gold Strike’s motion for a new trial. At this hearing, Gold Strike informed the circuit court that it had been served with the complaint in a wrongful-death suit on May 2, 2011, and that it suspected Juror 11 had not disclosed a familial relationship with the wrongful-death decedent. At the hearing, the circuit court granted Gold Strike fifteen days to investigate this alleged relationship.
¶ 8. On May 18, 2011, Gold Strike filed an addendum confirming that Juror 11 and the decedent were first cousins. Gold Strike discovered that the decedent was an employee of a custodial-housekeeping vendor called FSS,[4] but she was working inside the Gold Strike hotel on the day she died. Gold Strike attached to the addendum an affidavit, which was completed by Juror ll’s relative. The relative attested that: (1) Juror ll’s aunt was the representative for the wrongful-death beneficiaries of the decedent and the administratrix for the estate of the decedent; and (2) Juror 11 and the decedent were first cousins. Gold Strike also attached the wrongful-death complaint to its addendum. According to the allegations in the wrongful-death complaint filed against Gold Strike and FSS, the decedent “was intentionally, willfully, or wantonly prevented from leaving work to seek medical care by employees of Gold Strike and/or FSS, and as a result, suffered injuries and ultimately died” on May 28, 2010.
¶ 9. Based on the post-trial discovery of the two jurors’ former employment with Gold Strike, and Juror ll’s familial relationship with the decedent, Gold Strike argued a new trial should have been granted because the two jurors failed to disclose such information during voir dire. On June 23, 2011, the circuit court entered an order denying Gold Strike’s motion for a new trial or, in the alternative, a remitti-tur. Gold Strike appealed.
DISCUSSION
I. Whether the circuit court should have granted a new trial due to jury members’ failure to respond to certain questions during voir dire.
¶ 10. Mississippi Rule of Civil Procedure 59(a) states that “[a] new trial may be granted to all or any of the parties and on all or part of the issues ... in an action in which there has been a trial by jury ... for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of Mississippi^]” Our supreme court has set forth the following test to determine whether a juror’s failure to respond to voir dire questioning warrants a new trial:
The failure of a juror to respond to a relevant, direct, and unambiguous question leaves the examining attorney uninformed and unable to ask any followup questions to elicit the necessary facts to intelligently reach a decision to exer *984 cise a peremptory challenge or to challenge a juror for cause. Therefore, we hold that where ... a prospective juror in a criminal case [5] fails to respond to a relevant, direct, and unambiguous question presented by defense counsel on voir dire, although having knowledge of the information sought to be elicited, the trial court should, upon motion for [a] new trial, determine whether the question propounded to the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (8) whether the juror had substantial knowledge of the information sought to be elicited. If the trial court’s determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror’s failure to respond. If prejudice reasonably could be inferred, then a new trial should be ordered. It is, of course, a judicial question as to whether a jury is fair and impartial!,] and the court’s judgment will not be disturbed unless it appears clearly that it is wrong.
Odom, v. State, 355 So.2d 1381, 1383 (Miss.1978).
¶ 11. In Odom, counsel for the defendant asked the prospective jurors during voir dire whether any of them had a close relative who was involved in law enforcement. Id. at 1382. A juror failed to respond to this question, but evidence later established that the juror’s brother was one of the police officers who was involved in the investigation of the crime with which the defendant was charged. Id. The same juror also failed to respond to the inquiry of whether there was any reason why any member of the panel could not render a fair and impartial verdict. Id. Counsel for the defendant argued that if the juror had responded to either of these questions, he would have used a peremptory challenge against the juror. Id. He also argued that the juror’s “lack of candor made it impossible for him to intelligently exercise his peremptory challenge!,] all in violation of Mississippi Code Annotated section 13-5-69[J” Id.[6] Applying the above test, the Odom court reversed the judgment and sentence and remanded the case for a new trial. Id. at 1383.
¶ 12. In Burroughs v. State, 767 So.2d 246, 250 (¶ 16) (Miss.Ct.App.2000), several questions were asked during voir dire regarding whether any prospective juror knew any of the witnesses. The circuit court called the names of all of the witnesses and asked the following:
[I]s there anything about your knowledge of or your acquaintance with either of the parties in this case or [the] witnesses or the attorneys!,] whether it’s a matter of like or one of dislike or whether it arises from friendship, personal association, business association, fraternal association!,] or otherwise!,] that will make it difficult or embarrassing for you to serve as a juror in this case?
Id. at 250-51 (¶ 16). The State also asked whether any of the jurors knew any of the witnesses. Id. at 251 (¶ 16). One juror failed to respond to these questions. Id. at (¶ 17). After the trial, the defendant’s counsel learned that the juror had previously employed two of the assault victims, *985 whom the defendant was charged with assaulting. Id. This Court noted that “a juror is ‘disqualified’ within the meaning of [Mississippi Code Annotated section 13-5-67 (Rev.2002) ] where on voir dire examination he or she has withheld information or misrepresented material facts.” Burroughs, 767 So.2d at 252 (¶ 19) (citing Myers v. State, 565 So.2d 554, 558 (Miss.1990)). We noted that under Odom, a new trial is warranted where “the question propounded to the juror was (1) relevant to the voir dire examination; (2) unambiguous; (3) the juror had substantial knowledge of the information sought to be elicited[;] and (4) prejudice in selecting the jury could reasonably be inferred from the juror’s failure to respond.” Id. (citing Odom, 355 So.2d at 1383). We further stated:
We need to be clear about the nature of the Odom rule. It imports an objective test: in the face of a clearly worded question propounded on voir dire examination, one that bears relevance to the case at bar, has the juror withheld substantial information or misrepresented material facts? Voir dire examination is often the most crucial crucible in forging our primary instrument of justice: the fair and impartial jury. Like a fine suit of clothes, a jury must be tailored to fit, and the court and counsel examine prospective jurors under settled rules tending toward that fit. When offering challenges for cause and challenges peremptory, parties and their lawyers must rely on the objective candor and responsiveness of prospective jurors, and nothing turns on who asks the question, so long as it was clearly worded. Following a jury’s verdict, where a party shows that a juror withheld substantial information or misrepresented material facts, and where a full and complete response would have provided a valid basis for challenge for cause, the trial court must grant a new trial, and, failing that, we must reverse on appeal. We presume prejudice.
Id. at (¶ 20) (internal citations omitted). We found that the juror’s failure to disclose the fact that he had previously employed the two assault victims warranted a new trial. Id. at 253 (¶ 22).
¶ 13. In this case, several questions were asked during voir dire, which Gold Strike contends should have elicited responses from Jurors 4 and 11. Gold Strike points to the following questions:
[VOIR DIRE BY THE COURT:]
Who all works at Gold Strike Casino? [ (Several jurors responded, but not Jurors 4 or 11.) ]
Y’all actually are employed with Gold Strike Casino. [ (Several jurors responded in the affirmative, but not Jurors 4 or 11.) ]
Y’all are excused.... I’m not going to make you sit here and go through this whole thing when I know I’m going to excuse you anyhow. [ (The jurors who answered affirmatively to the above questions were excused and left the courtroom.) ]
All right, we’ve talked about those that are employed at Gold Strike.... Anybody know Ms. O’Keefe? ... All right, how about Ms. Johnson?
All right, we have Mr. John Cushing, John Cushing, II, Mary Young, Ray Tr[u]deau, Harold Wolfe, and Dr. Charles Clark. Any of y’all related by blood or marriage to any of those witnesses? ... Any of you just know any of them? Just know them.
*986 A broad question: Is there anything about your knowledge or your acquaintance 'with either the parties, the witnesses, the lawyers, whether it is a matter of like or dislike or whether it arises from friendship, personal association, business association, fraternal affiliation, church membership, or otherwise, that would in any manner affect you in the trial of this case? If you haven’t already spoken up, speak up now.... All right, I see no hands.
How many of you — I’ve talked about people that are employed with Gold Strike. How many of y’all have relatives or loved ones that are working at Gold Strike? Oh, a lot of you. [ (Several jurors respond affirmatively, including Juror 11.) ]
[Juror 11]: First Cousin.
All right. Those of you that just responded — I’m not going to go individually — but those of you who just responded that have loved ones working out there, whether aunt, sister, cousin, whatever, the defendant in this case is Gold Strike Casino. You don’t work for them but you’ve got loved ones that work for them. Is there anything about the fact that you have these people in your life that have this affiliation with Gold Strike Casino that would in any way affect you as far as being a fair and impartial juror in this case? Anybody? [ (Two jurors respond affirmatively, but Juror 11 remained silent.) ]
All right. Anybody else? Nobody else? [ (Juror 11 remained silent.) ]
Also it was brought to my attention there are certain businesses in town that have some sort of — -maybe in town or not — business affiliation with the defendant. What did you say, like FSS? [Counsel for Gold Strike]: Yes, sir, FSS is one, Branstein is one, there’s a number.
[The court]: I’m sure there are. Any of you have any significant business affiliation with Gold Strike Casino? I don’t see any hands at all. All right.
Any of you had any loved ones that sued somebody? I see no hands.
Anybody have any interest in the outcome of this case favoring one side or the other? I see no hands. Are you aware of any bias or prejudice for or against either side in this case? If you are, now is the time to speak up. I don’t see any hands.
[VOIR DIRE BY CUSHING’S ATTORNEY:]
If there is a question I ask or the judge has asked or the other attorney asks that makes you think maybe that applies to me or maybe I should answer that, that probably means you should. So please go ahead and answer for us.
So please just let us know if you feel for any reason that you just can’t be fair in this particular case[,] and no one will think bad of you at all.
If this was your case, if you were my client or ... the defendant in this case, would there be any reason why you wouldn’t want yourself on the jury? Or someone just like you? For whatever you’re thinking right now, is there something nagging in the back of your head that I haven’t asked about or the judge hasn’t asked about? Is there someone saying maybe I just shouldn’t be a juror *987 on this case, not because you would rather go home, but because there is some nagging doubt you have about your qualifications to be a juror on this case? No hands.
[VOIR DIRE BY GOLD STRIKE’S ATTORNEY:]
Now Judge Webster has already asked you some questions about whether you worked at Gold Strike, whether anybody you know works at Gold Strike, whether your family works at Gold Strike. And you all have been very responsive thus far. Let me turn that question around a little bit. Is there anybody here that has ever been laid off, terminated, or otherwise let go from Gold Strike? Nobody? The same question with regard to the outside vendors, the other companies like FSS or Ronstadt or Sun Landscaping. Anybody ever worked at Gold Strike and been let go, terminated, laid off, because of something that happened at Gold Strike Casino?
So is there anybody out there who has a reason to not like Gold Strike Casino for any reason? For example, anybody ever lost a lot of money at Gold Strike? Sometimes that happens. Sometimes you have a bad experience as a customer. You don’t like the way a waitress treated you, they messed up your hotel reservation, you thought you might have been entitled to a free buffet but you weren’t. Anything like that would cause anybody out there to have a little bit of a bad, bad feeling towards Gold Strike Casino?
Anybody other than [Juror 1] have any kind of bad experience, bad taste in your mouth about my client[,] Gold Strike Casino? [ (No response from Juror 11.)]
¶ 14. After everyone was finished asking questions during voir dire, the circuit judge stated in chambers to the attorneys: “I’m excusing everybody that was employed with Gold Strike for cause.” (emphasis added).
¶ 15. The circuit court denied Gold Strike’s motion for a new trial, reasoning as follows:
The difficulty in the instant case is that the questions asked by the court and counsel focused upon either those members of the jury venire who were currently employed with Gold Strike or who had been laid off, terminated [,] or otherwise let go from Gold Strike. The facts are undisputed that both juror no. 4 and juror no. 11 resigned their respective employment with [Gold Strike]. In this court’s view, the phrase “laid off, terminated!,] or otherwise let go” — used in the context of employment — suggests an employee who has been involuntarily separated from employment, a situation where the employee is fired or for whatever reason does not leave on his/her own volition. According to the evidence presented, neither of the subject jurors were “laid off, terminated[,] or otherwise let go from Gold Strike.” Both of the subject jurors left employment with Gold Strike of their own volition — they resigned. In addition, defense counsel argues that jurors no. 4 and 11 should have responded to the question regarding anyone having a “significant business affiliation with Gold Strike Casino.” The court well recalls the context in which the “business affiliation” question was posed. In the opinion of the court, this question did not call upon jurors who had been previously employed with Gold Strike, but rather attempted to identify any prospective jurors who might have been employed with or had some interest in one of those companies *988 that had a significant business affiliation with [Gold Strike].
As indicated earlier, the test for determining if a juror improperly failed to respond to a question asked during voir dire is whether the questions was [sic] (1) relevant to the voir dire examination; (2) was the question unambiguous; and (3) did the juror have substantial knowledge of the information sought to be elicited.... Certainly the questions asked during voir dire were relevant to the voir dire examination. However, within the context of what information defense counsel argues should have been divulged — that jurors no. 4 and 11 were former employees of [Gold Strike]— those questions regarding employment which were asked during voir dire must be considered ambiguous. No direct, unambiguous question was asked of the jury venire regarding former employment with Gold Strike.... As such, this court cannot find that either juror no. 4 or juror no. 11 failed to respond to a pertinent question during voir dire. This claimed error is without merit.
¶ 16. We agree with the circuit court’s resolution here. Upon a thorough review of the record, it is clear that the jurors were never asked whether they were former employees of Gold Strike; rather, the closest question was whether any juror had been terminated, fired, or otherwise let go from Gold Strike. The personnel records of both Juror 4 and Juror 11 indicated they resigned. Therefore, because there was no unambiguous question pertaining to the jurors’ former employment with Gold Strike, this issue is without merit.
¶ 17. As to Juror ll’s failure to disclose the wrongful-death lawsuit, the circuit court found as follows:
Gold Strike asserted that juror no. 11 was biased on the basis that a wrongful[-]death lawsuit had been filed against Gold Strike for the alleged wrongful death of the juror’s first cousin — also a former employee of [Gold Strike]. Based upon Gold Strike’s assertion, the court allowed Gold Strike additional time to develop evidence regarding this allegation. The evidence produced by Gold Strike clearly suggests that juror no. 11 is in fact the first cousin [of] the decedent for whom the wrongful[-]death action has been filed. Notwithstanding, and despite the protestations of Gold Strike, such information, in and of itself, does not necessarily require a new trial. The court has reviewed the wrongful[-]death pleadings filed on the behalf of the wrongful[-]death decedent. According to the [c]omplaint, the wrongful[-]death beneficiaries are the children of the decedent. As such, juror no. 11 would have no financial interest in the outcome of the wrongful[-]death action. In fact, an argument could be made that if juror no. 11 was influenced by the fact that a wrongful[-]death action was being planned by his relatives against [Gold Strike], it would behoove the wrongful[-]death action that Gold Strike not be required to pay a money judgment prior to the resolution of the wrongful[-]death action.
Gold Strike’s argument of juror bias is persuasive only if you assume that the responses or lack of responses by juror no. 11 were intended to advance a hidden agenda to somehow get back at [Gold Strike] for perceived complicity in the death of his relative. Absolutely no proof has been brought forward to substantiate any such assertion. While Gold Strike may have its suspicions, it has not produced the proof necessary to set aside the verdict of this jury on this ground.
*989 ¶ 18. We agree with the circuit court’s reasoning as to Juror 11. We further note that there was no evidence that Juror 11 “had substantial knowledge of the information sought to be elicited,” in that there was no evidence that Juror 11 knew of his cousin’s death at the time of voir dire or that Juror ll’s aunt planned to file a wrongful-death suit against Gold Strike. Burroughs, 767 So.2d at 252 (¶ 19) (quoting Odom, 355 So.2d at 1388). We note that Juror 11 did respond to the question: “How many of y’all have relatives or loved ones that are working at Gold Strike?” Juror 11 stated: “First cousin.” Interestingly, at the time of voir dire, Juror ll’s first cousin had already passed away.[7] And during the post-trial proceedings, the parties did dispute whether Juror 11 knew of his cousin’s death at the time of voir dire.[8] However, neither side presented any admissible evidence as to whether Juror 11 knew about his cousin’s death or the wrongful-death suit filed after voir dire. There was no proof that Juror 11 “had substantial knowledge of the information sought to be elicited” as required under Odom and Burroughs. Id. This issue is without merit.
II. Whether the circuit court erred in denying Gold Strike’s motion for a remittitur.
¶ 19. Gold Strike argues that the circuit court should have granted its motion for a remittitur because the $250,000 verdict was excessive where Cushing incurred medical expenses of $6,708 and lost wages of $6,926.07. “A motion for [a] re-mittitur is in the discretion of the trial judge and will not be reversed unless the trial judge abused that discretion.” Kmart Corp. v. Lee, 789 So.2d 103, 108-09 (¶ 26) (Miss.Ct.App.2001) (citing Roussel v. Robbins, 688 So.2d 714, 724 (Miss.1996)). Cushing, “as the injured party, has the burden of going forward with sufficient evidence to prove her damages by a preponderance of the evidence.” Cade v. Walker, 771 So.2d 403, 406 (¶8) (Miss.Ct.App.2000). In determining whether Cush-ing met her burden in establishing her damages for “present, past, and future pain and suffering, mental anguish[,] and past medical expenses, we are required to view the evidence in the light most favorable to the jury’s verdict, giving her the benefit of all favorable inferences that may reasonably be drawn.” Cade, 771 So.2d at 407 (¶ 8).
¶ 20. Our remittitur statute provides:
The supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for [a] new trial or affirm on direct or cross[-]appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence. If such additur or remittitur be not accepted[,] then the court may direct a new trial on damages only. If the additur or remittitur is accepted and the other party perfects a direct appeal, *990 then the party accepting the additur or remittitur shall have the right to cross[-]appeal for the purpose of reversing the action of the court in regard to the additur or remittitur.
Miss.Code Ann. § 11-1-55 (Rev.2002) (emphasis added). Under this statute, a “re-mittitur can be awarded by the court finding that either: (1) the jury or trier of fact was influenced by bias, prejudice, or passion, or (2) the damages awarded were contrary to the overwhelming weight of credible evidence.” Cade, 771 So.2d at 407 (¶ 10). These two standards essentially are one and the same:
The overwhelming weight of credible evidence standard is objective and applied by reference to the law on recoverable damages when applied to the evidence in the case. Such matters are reviewed on appeal for abuse of discretion. The bias, prejudice^] or passion standard is purely a circumstantial standard since we obviously have no way of knowing what was in the jury’s mind. When this Court reviews the action of the jury after the trial court has refused to grant a new trial on the question of damages, the question then becomes whether the verdict was either so excessive or inadequate as to shock the conscious and to indicate bias, passion[,] and prejudice on the part of the jury, or, whether the jury failed to respond to reason. Evidence of corruption, passion, prejudice^] or bias on the part of the jury is an inference, if any, to be drawn from contrasting the amount of the verdict with the amount of the damages. The Mississippi Supreme Court has stated that while pain and suffering is, to a large degree, not susceptible to monetary qualification, the jury necessarily has especially broad leeway. It, nevertheless, recognized that the sky is not the limit.
Id. at 407-08 (¶ 11) (internal citations omitted). “We thus review a claim of exces-siveness ... by comparing the awards at issue with rulings in other factually similar cases decided under controlling law.” Id. at 408 (¶ 12). “The jury’s award will be disturbed only if it is entirely disproportionate to the injury sustained.” Id.
¶ 21. “Due to the uncertainty of the monetary value placed on pain and suffering and future damages, we have affirmed damages up to fifty-one times the actual damages shown.” Kroger Co. v. Scott, 809 So.2d 679, 684 (¶11) (Miss.Ct.App.2001) (citing Cade, 771 So.2d at 410 (¶ 20)). In fact, our supreme court has upheld a jury’s verdict that was nearly 100 times the medical expenses where the injured person suffered headaches, soreness, dizziness, recurring nightmares, depression, and post-traumatic stress syndrome after being shot. See Gatewood v. Sampson, 812 So.2d 212, 223-24 (¶¶ 26, 29) (Miss.2002); see also Dorrough v. Wilkes, 817 So.2d 567, 575 (¶30) (Miss.2002) (upholding a jury’s verdict 38.5 times the medical expenses); Edwards v. Ellis, 478 So.2d 282, 289 (Miss.1985) (upholding a jury’s verdict 40 times the medical expenses).
¶ 22. In APAC Miss., Inc. v. Johnson, 15 So.3d 465, 479 (¶38) (Miss.Ct.App.2009), this Court upheld a jury’s verdict that was 27.7 times the medical expenses where the injured person suffered fractures, wore a neck brace, experienced ongoing neck pain, had trouble sleeping, and was required to take pain medication. Further, the injury prevented her from participating “in several activities — attending college, being a band booster (i.e., assisting the local high school band with fund raisers, ordering t-shirts, chaperoning band trips), and taking care of her grandchildren due to the pain she was experiencing.” Id.
*991 ¶ 28. In this case, the jury awarded $250,000, and Cushing incurred medical expenses of $6,708 and lost wages of $6,926.07. This verdict is about 87 times her medical expenses, or only 18 times her actual damages. Cushing broke her right elbow as a result of the fall. She testified that the pain was “as excruciating as passing a kidney stone.” She was required to take pain medication and undergo physical therapy. She stated that her elbow still hurts her every day, and that stirring a pot of beans is painful. Cushing also testified that her elbow injury adversely affected her at work:
I had a difficult time at work. My manager even counseled me, even though they knew I was having problems when I came back to work. I couldn’t lift. And my cases are large cases. They’re as large as those on that table that we had to carry for our taxpayers. And I had to have other people help me carry my case. I had to have other people pick up my slack on my work load. And my manager actually recommended that I go to the union and apply for disability. I did go to the union. But I was too proud to apply for disability.
¶ 24. Cushing testified that because of her elbow injury, she could no longer rake leaves. She also testified that she used to enjoy taking care of her vegetable garden, but she is unable to garden at all since her elbow injury. She stated that she loves to iron, but her husband must iron the clothes now because she is unable to do so with her elbow injury.
¶ 25. Cushing stated that she was unable to clean her house like she used to:
I love to clean. I know that sounds crazy, but we lived in like a 1973 mobile home[,] and it was old and ... wasn’t in real good shape. So I felt like if I kept it clean, it wouldn’t look so bad[,] and I thought that was good for my kids and myself and all of us. So even though I worked, I had three kids to raise, and I would come home and ... clean like two hours at night[,] and I would clean on the weekend. I just did that. I like to do that. I’m real picky like that.... [Now] I don’t. I try. Like trying to scrub with your left hand is kind of hard to do, ya’ll. You can’t do that. So [my husband] does.
¶ 26. Cushing stated that her elbow injury adversely affected her in the bathroom:
Q: What other things can’t you do now that you could do before your injury?
A: This is embarrassing, but when I have to go to the bathroom, I can’t wipe myself off very well. Because I have to use my left hand. And sometimes I don’t get my pants down fast enough. And I have an accident. I never had that problem ever.
Q: But how often does that happen?
A: Every day. Especially when you’re at work it is very embarrassing. I would have to bring clean underwear with me to work.
Q: And the reason you can’t use your right hand to do it is why?
A: Because it — it’s not because of the hurting. It won’t reach.... I can’t reach to pull them down all the way with the right hand. I have to use the left hand and I’m right-handed. It won’t pull them down.
Q: It won’t reach because it won’t straighten out?
A: Exactly.
Q: What about when you shower? Does it affect your ability to take a shower?
*992 A: Yes, sir, the same thing. When you’re trying to wash behind you, you know, I’m right — handed[,] so I have to use my left[.] I probably don’t get as clean as I should.
Q: What about washing your hair?
A: Same thing. I used to put my hands on my head. I have to use the left hand most of the time[,] and I can’t reach back here and stuff.
¶ 27. Cushing testified that her injury affected her sexual relationship with her husband:
Q: [Sjexually with your husband, how has your injury affected you?
A: ... Um, my husband and I have been married for 40 years. And we’ve had a good marriage. And for the past four years, I’ve not been able to take care of my husband sexually. I believe I should be able to do that.
Q: And is that due to your injury to your elbow?
A: Yes, sir. I’m depressed a lot. Because I can’t do that. And I have pain in my elbow[,] and there’s [sic] things that you do with your husband sexually[,] that you want to be able to satisfy your husband[,] and you can’t. And that’s wrong.
¶28. Cushing stated that her injury affected her ability as a mother:
Q: How [do] the problems with not being able to cook like you used to ... and clean like you used to ... and help around the house like you used to ..., how does that make you feel?
A: Well, I'm the mama[,] and I believe mamas are supposed to be able to take care of everything. And it is real hard for me to have my kids see that I can’t do things. Because, like I said, you know, your kids come to mama for help. It’s not supposed to be your kids helping you. You know, you’re supposed to be doing this for your kids. And I have a lot of pride[,] and it really bothers me that I can’t do those things.
¶ 29. We note that “[i]t is the jury that determines the weight of the testimony and the credibility of the witnesses at trial, and it is the primary province of the jury to determine the amount of damages to award.” Rhodes v. Raffeo, 74 So.3d 915, 918 (¶ 13) (Miss.Ct.App.2011). Viewing the evidence presented and the verdict awarded in the light most favorable to Cushing, we cannot say that the verdict “shock[s] the conscious.” Cade, 771 So.2d at 407-08 (¶ 11). Further, there is no evidence of passion, prejudice, or bias on the part of the jury in reaching its verdict. Id. Therefore, we affirm the circuit court’s denial of Gold Strike’s motion for a remit-titur.
¶ 30. THE JUDGMENT OF THE TU-NICA COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, MAXWELL AND FAIR, JJ., CONCUR. CARLTON, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.

. Trudeau worked at Gold Strike from February 25, 1999, to July 22, 2010.

. Young began working at Gold Strike on June 15, 2001, and was still employed there at the time of the trial.

.Wolfe worked at Gold Strike from July 21, 1994, to February 23, 2009.

. FSS was also named as a co-defendant in the wrongful-death suit filed against Gold Strike.

. We note that the Odom test is "equally applicable to allegations of juror misconduct in civil suits.” Mariner Health Care, Inc. v. Estate of Edwards, 964 So.2d 1138, 1147 (¶ 17) (Miss.2007).

. Mississippi Code Annotated section 13-5-69 (Rev.2002) states that "the parties or their attorneys in all jury trials shall have the right to question jurors who are being impaneled with reference to challenges for cause, and for peremptory challenges!.]”

. The decedent passed away on May 28, 2010. Voir dire took place on March 14, 2011, nearly one year later. The wrongful-death suit was filed on April 15, 2011, about one month after voir dire.

. Counsel for Cushing improperly obtained affidavits from several jurors after the trial, which we will not consider due to the impropriety of such affidavits under Rule 606(b) of the Mississippi Rules of Evidence and Gladney v. Clarksdale Beverage Co., 625 So.2d 407, 419 (Miss.1993).