# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-01007-COA

ABL MANAGEMENT, INC.                                      APPELLANT

v.

ALBERT ROWELL                                            APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 08/21/2024 |
| TRIAL JUDGE: | HON. ROBERT KEITH MILLER |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT ELLIOTT BRIGGS III |
| | CYNTHIA GOODWIN DENLEY |
| ATTORNEY FOR APPELLEE: | DANIEL MYERS WAIDE |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 01/20/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT**:

¶1. A man working in a kitchen slipped on ice in a freezer and fell. His arm and shoulder started hurting after his fall. His pain continued for over two years, but he had limited access to medical resources.

¶2. The man later sued a company that oversaw and managed the kitchen where he worked, claiming negligence. A jury found the company liable for the man's injuries and awarded him damages. The company appeals. Finding no reversible error, we affirm.

## STATEMENT OF THE FACTS

¶3. When the injury at issue occurred, Albert Rowell was housed at the Jackson County Adult Detention Center. He was a trustee of the facility assigned to work in the kitchen as

a baker.

*The Role of ABL Management*

¶4.    The JCADC is a jail facility located in Pascagoula. At some point, the officials at JCADC contracted with a company called ABL Management Inc.

¶5.    The contract and bid documents between ABL and JCADC include a "Hazard Identification Checklist" and a "Hazard Identification Safety Meeting" sheet. ABL's hazard checklist states: "Facility should be inspected for hazards. Once found, hazards *must* be *immediately corrected*." (Emphasis added). The checklist reflects: "Freezer: Freezer floor kept free of ice build-up[.]" Similarly, the hazard safety sheet reflects: "Inspect the facility for hazards and *immediately correct the unsafe condition*" (emphasis added); and "Freezer: Freezer floor kept free of ice build-up."[1]

¶6.    The contract documents also include several pages related to ABL's employment structure, outlining specific job titles and descriptions. In particular, one of ABL's pages provides for a "Food Service Director." The list of "duties and responsibilities" required of this position includes "implementing and maintaining safety programs for employees *and inmate workers*." (Emphasis added).

---

[1] Further emphasizing the extent of ABL's overall responsibilities, the hazard checklist also requires: "Freezer lights working and enclosed[;]" "Work Area Housekeeping: Floors free of grease, food spillage and debris . . . water not standing in wash areas[;] . . . Ice kept off the floor by ice machines[;] Floors maintained to prevent grease build-up[.]" The same is also required per the hazard safety sheet: "Work Area Housekeeping: Floors free of grease, food spillage and debris[;]" "water standing in wash areas[;]" and "ice kept off the floor by ice machines[.]"

2

¶7.    At trial, the jury heard from Kelton Cuevas,[2] who testified as "a representative of ABL." Cuevas offered the following testimony:

> [Attorney]:  Mr. Cuevas, can we agree that ABL was responsible for cleaning the freezer floor?
> [Cuevas]:    Yes, sir.
> [Attorney]:  And that would include removing the ice on the floor?
> [Cuevas]:    The ice that could be removed, absolutely.
> . . . .
> [Attorney]:  [J]ust whose job was it to keep the floor cleaned up?
> [Cuevas]:    It would be ABL's responsibility to keep the floor clean.

He was then pointedly asked by Rowell's counsel, "[I]t fell on ABL to ensure the area was still safe even with the problem, correct? You were the ones managing and supervising the kitchen?" Cuevas answered, "Correct, we were supervising the kitchen."

¶8.    Additional evidence was presented in the form of an affidavit. The director of safety and risk management for the company that took over ABL's business submitted an affidavit on ABL's behalf. The safety director's affidavit confirmed that there was "a contract for food preparation and service of meals . . . at the . . . JCADC[.]" The director attested that "[a]t the

---

[2] It appears from the record that sometime between Rowell's slip-and-fall and the start of trial, ABL Management was bought out and acquired by another company. This other company then took over ABL's business dealings, including the contract with JCADC. At the time of trial, Cuevas was a district manager of this other company.

At trial, Cuevas testified that "[his] capacity in 2016" "was running Mississippi Department of Corrections food service for Aramark" and "the commissary in Jackson County." Cuevas clarified for the jury that he was not employed by ABL when Rowell's fall occurred and had not actually "become associated with ABL" until over three years later. And then when Cuevas was specifically asked, "So when we're talking about any specific facts, you don't have any personal knowledge about what actually happened in this case," he responded, "I do not, no, sir."

3

time of Mr. Rowell's alleged injury," the company "had three employees on site at the JCADC," which included "the food services director."

*The Icy Kitchen Freezer*

¶9.     Rowell took the witness stand at trial and testified that as a baker, his work area encompassed the oven and the mixers, as well as the cooler if he had to put up leftovers. When asked about the kitchen set-up, he expounded on the layout and noted there was a difference between the "cooler" and the "freezer" at JCADC. Rowell explained, "[Y]ou got to walk into the cooler in order to get to the freezer. It's connected together."

¶10.    Put simply by Rowell, "[t]he cooler is where you keep all your food cool, and the freezer is where you keep all your food frozen." And when later asked whether "it would be impossible to completely avoid that [freezer] area," Rowell testified, "I don't see any way around it. You got to go in and out and get the meat and bring it out."

¶11.    He then explained the problem: "In the cooler, the lights would fill up with water. In the freezer, they'd fill up with water and freeze, and eventually run over into the floor." He recounted in more detail:

> When we first noticed it, it had just started dripping. It took a long time for it to fill up the globe [lights]. Eventually, it busted the lights, then there was no lights. So, eventually, it started filling up and overflowed out of the globe onto the floor. *So, it's just a little chunk of ice there just where it dripped, so it built up in the few spots it dripped. Just a little chunk of ice would keep building up* . . . . About every other day, you'd go in there and see where it's done drip, drip, drip, *like overnight*. Next day, you might see a little bitty spot there. Eventually, it just continued getting worse.

(Emphasis added).

4

¶12.    Rowell and the other kitchen workers reported the problem to "one of ABL's supervisors." The safety director's affidavit attested that ABL's Food Service Director "became aware that there was an issue with accumulation of water in the kitchen freezer."

¶13.    Cuevas further told the jury that "ABL was aware that there was a problem causing ice to build up on the floor of that cooler;" "ABL was aware [the ice] was an ongoing problem;" and "ABL cleaned up the ice on many occasions."

¶14.    According to Rowell, once the problem was reported, he and the other kitchen workers "just went in there and knocked [the ice] down." His counsel asked for clarification: "[W]ho would go in and knock those little mounds of ice over?" Rowell answered, "We did." And during cross-examination, defense counsel questioned Rowell as to whether ABL's Food Service Director "asked you and assisted you in breaking up this ice on numerous occasions," to which he answered affirmatively.

*The Slip-and-Fall Incident in the Freezer*

¶15.    Rowell testified that one afternoon, he and the other trustees were prepping meals to be served the next day. He was helping another inmate by getting a box of meat from the freezer. Some of the freezer lights were broken at the time. As he stepped into the dark, unlit freezer, he slipped on a patch of ice, and his feet came out from under him. He tried to catch himself, grabbing a hold of a shelf rack and hanging on by his arm until another inmate helped him.

*The Consequences of the Fall*

5

¶16.　The day after Rowell's fall in the freezer, he began experiencing sharp pain in his arm and shoulder that had not been there before his slip-and-fall. This pain continued to get worse over the next couple of weeks. Rowell sought help from medical staff within the Mississippi Department of Corrections. He later testified that to do so, he was required to initiate an official request for medical treatment by filling out a "Medical Service Request Form." [3] He submitted a total of 17 forms over an 11-month period after his fall. He continuously raised concerns about his arm and shoulder pain in each new form. All of these forms were presented to the jury at trial.

¶17.　To show the extent and ongoing nature of Rowell's medical complaints, the following is an assembled list of all 17 completed forms:

| 7/3/2016 | "I also fell at my county jail a week or so, hurting my arm & hip." |
|---|---|
| 7/10/2016 | "My arm & hip is still hurting me from slipping down at my county jail." |
| 7/16/2016 | "My hip and arm is still hurting. I need to see a doctor or get it ex-rayed." |
| 8/4/2016 | "My right arm is still hurting more & more. I need it ex-rayed." |
| 8/30/2016 | "I really need to see a doctor about my arm. I am in so much pain." |

---

[3] Within a few days after his slip-and-fall, Rowell was transferred from the jail facility in Jackson County to a prison facility in Rankin County, where he remained until he was later released on parole. So, although the fall itself occurred at JCADC, because Rowell was transferred shortly thereafter, he actually received medical care from staff at the Rankin County facility.

| | |
|---|---|
| 9/5/2016 | "I believe my arm is broke." |
| 9/6/2016 | "I believe I have a chip or broken bone in sho[u]lder." |
| 9/18/2016 | "I need to see about my ar[m], the nurse Pract[itioner]." |
| 10/21/2016 | "I need something done about my arm. I have [been] compl[ain]ing scence June. (3+ months) **I am** [in] **pain!**"[4] |
| 11/2/2016 | "My hip is back hurting again . . ." |
| 11/17/2016 | "My arm is getting [worse], and in more pain then before." |
| 12/15/2016 | "I need a bottom [bed] . . . because of my arm . . ." |
| 12/24/2016 | "I need to talk with doctor Brazer about my MRI on my shoulder to see what we are going to do."[5] |
| 3/24/2017 | "I need to talk to my pervider about the seriousness of my shoulder, the pain." |
| 6/7/2017 | "My shoulder is in pain again. The shot has ware off." |
| 6/28/2017 | "I am still in pain with my shoulder. Look at record." |
| 6/28/2017 | "I need my refill of Ibuprofen 800 mg for my on going problem with my shoulder. **(Pain)**." |

¶18.    The record shows that Rowell was released on parole two months after his last form was submitted. He would subsequently testify at trial that he was still suffering from arm and shoulder pain over a year after his release and pursued other medical treatment.

**PROCEDURAL HISTORY**

---

[4] The original handwriting was emboldened. Several handwritten words in this sequence are not legible and are now dark blots on the page, seemingly erased by damage to the document.

[5] Later testimony from Rowell reflects that he saw a "Doctor Brazier" sometime after November 17, 2016, but documentation from these visits is not in the record. Similarly, Rowell testified that a nurse practitioner at the Rankin County prison x-rayed his arm and shoulder at some point, but these medical records are not in the case file.

¶19.   Rowell sued ABL Management.[6] While Rowell originally filed his complaint in circuit court in Jackson County, it was later transferred to county court. ABL was the only remaining defendant.

¶20.   Rowell's complaint alleged that ABL "was contracted by Jackson County, Mississippi to run and operate the kitchen in the [JCADC] where Plaintiff was injured." Also, that "ABL was aware of the dangerous condition in the kitchen yet took no action to warn Plaintiff about the dangerous condition, nor did ABL take reasonable or appropriate measures to mitigate the dangerous conditions caused by the leaky and/or defective freezer." He asserted negligence by ABL, claiming ABL was responsible for "careless and negligent acts and omissions" which included:

> Failure to keep the freezers in a reasonably safe condition; . . . Failure to cure dangerous conditions which it knew, or should have known, existed because of the freezers; Failure to warn Plaintiff of hazardous conditions caused by the freezer[;] . . . Negligent supervision and monitoring of the employees or agents hired to maintain the freezer in a safe condition; [and] Improperly trained personnel in in recognizing and correcting dangerous conditions caused by the freezer[.]

He requested "nominal and actual damages" and "compensatory damages," in addition to other relief.

¶21.   Rowell's case proceeded to trial in February 2023. After Rowell rested his case, ABL

---

[6] Rowell filed a complaint in October 2017 against several other defendants, none of whom is a party to this appeal. He was then granted leave to amend his complaint a first time in April 2018. Subsequently, Rowell was granted leave to amend his complaint a second time in May 2018. This second amended complaint was filed in June 2018 and named ABL Management as a defendant.

moved for a directed verdict. ABL first argued that "the testimony is pretty clear that ABL was not responsible for this area of the kitchen," "the freezer." Second, "there's really no proof at this time of medical causation;" "[n]o injury whatsover;" and "no expert testimony or any proof to establish that [any injury] was a result of this fall." ABL's motion was denied. The trial continued to ABL's defense, but ABL promptly rested its case without calling any witnesses and unsuccessfully renewed its motion for a directed verdict.

¶22.    After the evidence was presented, the jury was given a series of twelve instructions. These instructions outlined the plaintiff's burden of proof, the definition of negligence, and the definition of proximate cause. The jury specifically received instructions on the elements required to prove general negligence, as well as the elements required to prove negligence under a premises-liability theory. Additionally, the county court gave several instructions regarding the verdict form and the verdict in general.  Only a few jury instructions are relevant on appeal and will be discussed as they arise later throughout this opinion.

¶23.    After deliberating, the jury returned the following verdict: "We the jury, find for the Plaintiff Albert Rowell, and award him damages as follows: Albert Rowell $125,000. We further find and hold ABL Management, Inc. solely responsible for injury." A final judgment order was subsequently entered by the county court finding ABL liable and awarding Rowell $125,000 in damages.

*Post-Trial Motion*

¶24.    ABL next filed a motion seeking a judgment notwithstanding the verdict, a new trial,

9

or remittitur. In its motion, ABL argued Rowell "failed to meet his burden of proof as to duty, breach, causation or damages," such that a JNOV was appropriate. And in the alternative, ABL contended that a new trial or remittitur was warranted, "as the jury verdict is against the overwhelming weight of the evidence, is not based on any evidence presented at the trial, and shocks the conscience."

¶25. The county court ultimately denied the motion. In its order, the court found, "Rowell presented sufficient evidence that a juror could find that it was ABL's responsibility to keep the freezer floor free of ice and that Rowell was injured due to ABL's breach of their duty." And, "Rowell presented sufficient evidence that corroborated his testimony that his shoulder was injured in the fall." The county court held,

> This was not a complicated case. The fact that there was ice build-up on the freezer floor was undisputed. The fact that Rowell worked in the kitchen as a baker and was required to go in and out of the freezer was undisputed. That Rowell reported his slip and fall and began complaining of shoulder pain and continued to do so for the next two years was also undisputed.
>
> A case such as this does not require expert testimony. *Cole v. Superior Coach Corp*. 106 So. 2d 71 (Miss. 1958). The general rule in Mississippi is that expert testimony is not required where the facts surrounding the alleged negligence are easily comprehensible to a jury. *Hammon v. Grissom*, 470 So. 2d 1049 (Miss. 1985).

¶26. Next, in regard to a new trial, the county court held, "Based on the evidence and witness credibility, a reasonable hypothetical juror could have reached the conclusion that ABL had a duty to keep the freezer floor free of ice build-up and that their breach of that duty was the proximate cause of Rowell's injury." Therefore, deference was given to the jury's

10

decision.

¶27. As to remittitur, the court's order on ABL's post-trial motion specifically found: "Rowell only sought damages for his past medical expenses and for approximately two years or so of pain and suffering. He did not ask the jury to make an award for future pain and suffering or for lost wages or future disability." Also, "[b]y the time Rowell got to trial all medical treatment had ceased and he was able to work full time as a pipe fitter[.]"

¶28. The county court further found:

> The most significant difference between Rowell's case and all of the reported cases that this [c]ourt found was that at the time of the injury and for approximately two years following the injury, Rowell was incarcerated. He was an inmate in the County jail and an MDOC inmate in Rankin County. Therefore, medical treatment was not readily available to Rowell.

As a result, "[a]lthough he complained constantly about his shoulder pain, he was only allowed to see a doctor some four months after the initial injury to his shoulder[.]" The court noted that "Rowell had basically rehabbed [his injury] himself."

¶29. Lastly, the record shows the court considered that "[t]he trial of this matter was very civil;" "[t]here wasn't anything to inflame or incite the jury;" and "[t]here was no evidence of bias, prejudice or improper passion." In fact, as stated in the county court's order, "[i]f anything, the [c]ourt's only concern at the outset of the trial was that some of the jurors may harbor some prejudice against Rowell since he was a convicted felon and was in jail at the time of the injury."

¶30. ABL appealed the county court order to the circuit court. The circuit court held:

11

In this case, the evidence supports the verdict and ABL has not satisfied its burden as to the necessity of a remittitur. All evidence was presented to the jury and they, as the finder of fact, rendered a verdict based on the evidence presented. At trial, the Plaintiff had the burden of proving a causal nexus between the accident and the extensive medical treatment. The Plaintiff presented evidence as to the medical treatment that he received, and the costs incurred.

The jury determined that there was a sufficient causal link to the accident and the totality of the Plaintiff's injuries. This determination was supported by the evidence presented at trial.

The circuit court denied ABL relief, affirming the county court's order. Aggrieved, ABL appeals.

## DISCUSSION

¶31. On appeal, ABL raises three assignments of error—all of which involve the denial of its post-trial motions. ABL argues the lower court should have granted a judgment notwithstanding the verdict, a new trial, or, in the alternative, a remittitur.

¶32. As an initial matter, "the present appeal is primarily from the ruling of the county court rather than from the circuit court," and in such cases, "we review the county court's decision without deference to the circuit court's analysis." *Singh v. Singh*, 416 So. 3d 1019, 1022 (¶9) (Miss. Ct. App. 2025).

### I. The county court did not err by denying JNOV.

¶33. ABL initially argues that the county court should have granted its motion for JNOV. "A motion for judgment notwithstanding the verdict challenges the sufficiency of the evidence and asks 'whether the evidence, as applied to the elements of a party's case, is

12

either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated.'" *Radco Fishing & Rental Tools Inc. v. Com. Res. Inc.*, 407 So. 3d 167, 189 (¶62) (Miss. 2025).

¶34.   A ruling on a motion for JNOV is reviewed de novo on appeal. *Kirk v. Newton*, 380 So. 3d 252, 263 (¶26) (Miss. Ct. App. 2023). We "will affirm the denial of a JNOV motion if there is substantial evidence to support the verdict." *Id*. Evidence must be viewed "in the light most favorable to the appellee, giving the party the benefit of all favorable inferences that may be reasonably drawn from the evidence.'" *Id*.

¶35.   ABL argues that Rowell "failed to prove the most basic elements of his [negligence] case." Specifically, ABL contends that "[t]here is no proof in this record that on the day of Mr. Rowell's alleged fall, ABL had any knowledge that the problem in the freezer still existed;" "[t]he evidence . . . is undisputed that ABL had no control over the freezer, and no right or duty to make any repairs;" and "[t]here is no evidence . . . to prove that Mr. Rowell sustained any injury as a result of his alleged fall."

¶36.   "To succeed on a negligence claim, a plaintiff must prove the following by a preponderance of the evidence: duty, breach of duty, causation, and injury." *Brooks v. Jeffreys*, 368 So. 3d 356, 361 (¶12) (Miss. Ct. App. 2023). We look at each element in turn.

### A.   ABL's Duty to Keep the Freezer Floor Free of Ice

¶37.   The county court's order ruling on ABL's post-trial motion found, "Rowell's position was that ABL had the responsibility to remove the ice from the freezer floor," and "[i]t was

13

clear to the court, and obviously clear to the jury, that ABL was responsible for keeping ice off the floor in the freezer."

¶38. As previously detailed, Rowell presented the jury with contractual documents showing the duties and responsibilities owed by ABL with regard to the freezer. The "Hazard Identification Checklist" for ABL required "Freezer floor kept free of ice build-up." Rowell elicited a concession from ABL's representative, who confirmed ABL had a duty to keep the freezer floor free of ice: "It would be ABL's responsibility to keep the floor clean."

¶39. Therefore, we find a reasonable juror could have concluded that ABL owed a duty to Rowell to ensure the freezer floor was kept free of ice buildup and to immediately correct the unsafe condition of an icy floor.

## B. ABL's Breach of its Duty to Keep Floors Free of Ice

¶40. The county court's order on ABL's post-trial motion held, "Rowell and ABL offered testimony that there was a problem with ice accumulating on the floor in the freezer. . . . [I]t was undisputed that ice would accumulate on the floor and that it was a hazard to persons utilizing the freezer." Also, the fact "that there was ice build-up on the freezer floor was undisputed;" that Rowell "was required to go in and out of the freezer was undisputed;" and "[t]hat Rowell reported his slip and fall . . . was undisputed." Therefore, the trial court concluded, "It was clear to the court, and obviously clear to the jury . . . [t]hat ABL breached their duty to keep the ice from building up on the floor[.]"

¶41. At trial, Rowell testified that when he fell, "[he] remembered the ice being there" on

14

the freezer floor. The jury heard testimony from three different people who all confirmed that water leaked in the freezer, the water turned into ice, and the ice built up on the freezer floor. All three people provided evidence that ABL was informed about several prior instances of ice buildup and icy conditions. ABL representatives further confirmed that ABL had cleaned ice off the floor in the past.

¶42. There was evidence that ABL knew there was a recurring problem with water accumulating on the floor, as ABL advised the inmates working in the kitchen to avoid those spots, yet ABL failed to eradicate the water and ice as it built up. Therefore, we find the evidence supports that a reasonable juror could find ABL breached its contractual duty to keep the freezer floor free of ice buildup.

### C.     The Fall Tracing Back to ABL's Breach

¶43. The county court concluded that "a reasonable hypothetical juror could have reached the conclusion that ABL had a duty to keep the freezer floor free of ice build-up and that their breach of that duty was the proximate cause of Rowell's injury." In denying ABL's post-trial motion, the court found that "Rowell presented sufficient evidence that corroborated his testimony that his shoulder was injured in the fall," and he "produced records that showed his continued complaints regarding shoulder pain from . . . 2016 through June 2017."

¶44. "The general rule in Mississippi" is that "expert testimony is not required where the facts surrounding the alleged negligence are easily comprehensible to a jury." *Wal-Mart*

15

*Stores Inc. v. Johnson*, 807 So. 2d 382, 388 (¶15) (Miss. 2001). In that case, the plaintiffs "provided testimony that the[ir] car experienced noticeable problems after Wal-Mart worked on it and that these problems were not present before Wal-Mart worked on it." *Id*. Our Supreme Court held "[t]hat was sufficient to allow the jury to determine whether Wal-Mart, through some act or omission, caused those problems[.]" *Id*.; *see also Mauldin Co. v. Turnage*, 332 So. 3d 331, 336 (¶10) (Miss. Ct. App. 2021) ("[n]either party presented an expert to testify regarding Mauldin's alleged negligent repair of Turnage's tractor").

¶45. This Court has also explained that "negligence may be proved by circumstantial evidence where the circumstances are such as to remove the case from the realm of conjecture and place it within the field of legitimate inference." *Turnage*, 332 So. 3d at 336 (¶9) (quoting *Weathersby Chevrolet Co. Inc. v. Redd Pest Control Co. Inc.*, 778 So. 2d 130, 133 (¶9) (Miss. 2001)). For slip-and-fall cases, "the plaintiff may prove circumstances from which the jury might reasonably conclude that the condition of the floor was one which was traceable to the proprietor's own act or omission." *McCullar v. Boyd Tunica Inc.*, 50 So. 3d 1009, 1014 (¶23) (Miss. Ct. App. 2010).

¶46. Here, Rowell testified that his arm and shoulder pain were not present before he slipped on the ice in the JCADC freezer. The record shows that it was undisputed at trial that "Rowell reported his slip and fall and began complaining of shoulder pain and continued to do so for the next two years[.]" Based on the evidence and testimony presented at trial, we conclude a reasonable juror could find Rowell established the requisite causation between

16

ABL's breach of duty and his fall and subsequent shoulder pain.

### D. The Physical Injuries After the Slip-and-Fall

¶47. First, the county court found that "Rowell's medical records were placed in evidence without objection." The court's post-trial order emphasized that Rowell "was only allowed to see a doctor some four months after the initial injury to his shoulder." He presented evidence that he "was given injections in the shoulder after a diagnosis . . . caused by not moving his right arm" and that he "continued to seek treatment for his shoulder and was given more injections" after his release. But upon his release, "he had no job and no health insurance," and by the time he "could afford to go to the doctor . . . [t]he injury was too old," and "there just wasn't a lot the doctor could do for him."

¶48. Secondly, the county court determined Rowell's trial "testimony was based on his perception of his injury and the pain and suffering that he endured for over two years after the initial injury to his shoulder." And his claimed damages were only "for his past medical expenses and for approximately two years or so of pain and suffering;" not "for future pain and suffering or for lost wages or future disability." Consequently, the court held that "[a] case such as this does not require expert testimony" and found Rowell's evidence sufficient to establish the damages element of his negligence claim.

¶49. A plaintiff in a simple negligence action is not required to present medical expert testimony to establish injury and damages. *City of Jackson v. Graham*, 226 So. 3d 608, 613 (¶21) (Miss. Ct. App. 2017). And this Court recently reiterated that a plaintiff is "competent

17

to testify as to his own pain and suffering and to describe his physical injuries[.]" *Younger v. Southern*, No. 2022-CA-01228-COA, 2025 WL 1165244, at *9 (¶22) (Miss. Ct. App. Apr. 22, 2025) (quoting *Graves v. Graves*, 531 So. 2d 817, 822 (Miss. 1988) (while "competent to testify as to his own pain and suffering and to describe his physical injuries," plaintiff was "incompetent to testify regarding his own medical prognosis and treatment")), *pet. for cert. filed* (Miss. Nov. 10, 2025).

¶50.    Here, Rowell's claims for relief are for the pain and suffering he endured after his slip-and-fall in the freezer. He was not alleging a permanent medical disability or medical impairment. Rowell was competent to testify as to the physical injuries he endured during and after his fall. And because no medical prognosis or medical treatments were involved in his claims, nothing required Rowell to present a medical expert under the unique facts of this case.

¶51.    The separate opinion agrees that not every case requires a medical expert. As set out above, our Supreme Court has explained that a plaintiff is "competent to testify as to his own pain and suffering and to describe his physical injuries," although "incompetent to testify regarding his own medical prognosis and treatment." *Graves*, 531 So. 2d at 822.

¶52.    And we recently reiterated that principle in *Younger*, which involved a plaintiff's collision with a school bus. *Younger*, 2025 WL 1165244, at *1 (¶1). We found that the plaintiff had improperly tried to vouch for his own medical treatment and prognosis. *Id.* at *7 (¶23). There,

18

Southern's testimony clearly shows why testimony from his treating physicians was needed. Southern could not explain the meaning of certain conditions that were identified in his medical records, such as loss of lordosis, degenerative disc disease, spondylosis, and sacroiliitis. He *could have been* born with some of these conditions, others *may* be a natural result of the aging process, and some *may* be a result of trauma. There is no statement in the records by a treating professional where the person gives an opinion that these conditions were caused by the accident. As a result, without testimony from a medical expert or treating physician, we may only speculate as to the proximate cause of Southern's conditions.

*Id*. (emphasis in original).

¶53.    But the case at hand differs from *Younger* in meaningful ways.  The crux of Rowell's case is pain and suffering.  While the dissent characterizes the injury as "not obvious," the jury determined that it was obvious—because the injury was the pain and suffering suffered by the plaintiff.  Not only did the jury have before it the evidence of the 17 complaints made by Rowell for medical attention, the jury heard him explain how he was hurting—how he had to change bunks because he could no longer climb to the top bunk, how there was shooting pain in his arm, and how once he returned to society, he still could not play basketball with his grandkids because of the pain in his arm.

¶54.    If Rowell's claim was one arising from a medical diagnosis or based on medical negligence, the separate opinion would be correct that he would have required an expert to explain the causal link.  But that is *not* the nature of Rowell's claim in this case.

¶55.    Additionally, while ABL's arguments attempt to shift the focus away from Rowell's claims and, instead, onto the malfunctioning freezer equipment and who bore the responsibility to repair it, this case is *not about either*. Rather, Rowell's complaint centers

19

around ABL's responsibilities related to ice buildup on the freezer floor. Rowell claimed that ABL had a duty to keep the freezer floor clean and free of ice buildup, that ABL allowed water to accumulate on the freezer floor, that he slipped on a patch of ice that had built up, and that he suffered pain in his arm and shoulder after trying to catch himself when he slipped.

¶56. We find Rowell offered substantial evidence for a reasonable juror to find that he established damages by showing he suffered physical injuries to his arm and shoulder after his fall in the freezer and that his pain and suffering got progressively worse.

¶57. Upon viewing the evidence in the light most favorable to Rowell, we conclude that Rowell offered evidence from which a reasonable juror could find the elements of duty, breach, causation, and damages satisfied. Further, we find the jury's verdict is supported by substantial evidence. Therefore, the county court's denial of JNOV was not error.

## II. The county court did not err by denying a new trial.

¶58. Next, ABL argues that the county court should have granted its motion for a new trial. In contrast to JNOV, "[a] motion for a new trial challenges the weight of the evidence, and denial of a motion for a new trial is reviewed for an abuse of discretion." *Radco Fishing & Rental Tools*, 407 So. 3d at 189 (¶62) (citing *Miss. Transp. Comm'n v. United Assets LLC*, 188 So. 3d 508, 514 (¶24) (Miss. 2016)).

¶59. On appeal, ABL initially asserts that "the jury failed to follow the simple instructions of the court regarding the form of the verdict, adding a sentence to the end of the verdict

20

form stating that ABL was solely responsible for Mr. Rowell's fall and injuries." According to ABL, "[t]his verdict form tells us . . . the jury was unable to follow even the most simple instruction; and . . . their findings and verdict are against the overwhelming weight of the evidence."

¶60.    ABL contends that the facts in this case show that "ABL did not have any control whatsoever over the freezer which caused the water to leak and ice to build up on the floor;" ABL employees "reported the problem on multiple occasions, [and they] showed the problem to jail officials on multiple occasions[;] cleaned up the ice on multiple occasions[;] and repeatedly warned the inmate workers to be careful until the problem had been fixed." It is further argued that "[w]ith these facts . . . no reasonable juror could have concluded that ABL was in control of the area, and more egregiously, no reasonable juror could have heard the testimony in this case and determined that ABL was 100% at fault for what happened."

¶61.    Crucially, "[t]his Court presumes that jurors have followed the instructions of the court, because to presume otherwise would render the judicial system inoperable." *Kirk*, 380 So. 3d at 265 (¶31) (quoting *Evans v. State*, 226 So. 3d 1, 26 (¶60) (Miss. 2017)). Here, Jury Instruction 10 stated:

> The Court instructs the jury that when you reach a verdict in this case, it should be written on a separate piece of paper, need not be signed by you, and may be in either of the following forms:
>
> > If you find for the Defendant: We, the jury, find for the Defendant ABL Management, Inc.
> > If you find for the Plaintiff: We, the jury, find for the Plaintiff Albert Rowell, and award him damages as follows: Albert

21

Rowell $ ___ [.]

The trial court also gave Jury Instruction 12, which stipulated:

> If based on the other instructions given in this case, you find for the Plaintiff Albert Rowell against Defendant ABL Management, Inc., then you *must* go further and decide whether Albert Rowell or any other person or entity committed any act of negligence which proximately contributed to this accident and the alleged injuries of Albert Rowell. *If* you find from the preponderance of the evidence in this case that Albert Rowell or any other person or entity was also negligent in causing or contributing to the slip and fall incident in this matter, then you should first fix the amount you would have given to Albert Rowell for such injuries and damages, if any, and then reduce your verdict by the percentage of that negligence of any other party, if any, bears to the whole.

(Emphasis added).

¶62. Contrary to ABL's assertions, the handwritten verdict returned by the jury in this case is an *exact match* to wording within Instruction 10 and specifically considers whether ABL was the only negligent party as directed by Instruction 12: "We the jury, find for the Plaintiff Albert Rowell, and award him damages as follows: Albert Rowell $125,000. We further find and hold ABL Management, Inc. solely responsible for injury."

¶63. In a jury trial, "the jury determines the facts in disputes and is the 'sole judge of the credibility of witnesses and the weight and worth of their testimony.'" *Id*. at 264 (¶27) (quoting *Solanki v. Ervin*, 21 So. 3d 552, 568 (¶41) (Miss. 2009)). "[N]either the Supreme Court nor the Court of Appeals sits as thirteenth juror. We do not make independent resolutions of conflicting evidence. Nor do we re-weigh the evidence or make witness-credibility determinations." *Id*. at 265 (¶32) (internal quotation marks omitted)

22

(quoting *S. Cent. Reg'l Med. Ctr. v. Regan*, 303 So. 3d 432, 444 (¶23) (Miss. Ct. App. 2020)). In other words, "[a]s an appellate court, 'it is simply not our duty to decide the meaning and importance of these facts. That is the function of the fact[-]finder.'" *Turnage*, 332 So. 3d at 336 (¶9) (quoting *Weathersby*, 778 So. 2d at 134 (¶12)).

¶64. As already discussed in depth above, evidence in the record shows ABL was in control of the freezer floor. Indeed, the record contains evidence showing the condition of the freezer floor was a direct and sole responsibility of ABL to maintain for the safety of the inmate trustees under its supervision.

¶65. The jury heard the evidence Rowell presented at trial and observed the testimonies from Rowell and Cuevas firsthand. The jurors made their credibility determinations, weighed all the evidence, and found in favor of Rowell. This Court cannot sit as the thirteenth juror and re-weigh the evidence as ABL would seek to have this Court do.

¶66. We find the county court's denial of ABL's motion for a new trial was not an abuse of discretion.

### III. The county court did not err by denying a remittitur.

¶67. In the alternative, ABL contends that the county court should have granted its post-trial motion for a remittitur. "The standard of review for the denial of a remittitur is abuse of discretion." *Kirk*, 380 So. 3d at 274 (¶57) (quoting *Entergy Miss. Inc. v. Bolden*, 854 So. 2d 1051, 1058 (¶20) (Miss. 2003)).

¶68. "[A] court's power to impose a remittitur derives from Mississippi Code Annotated

23

section 11-1-55 (Rev. 2019)." *Haynes v. Beckward*, 358 So. 3d 1080, 1090 (¶32) (Miss. Ct. App. 2023).[7] A request for "a remittitur may be awarded: (1) if the court finds that the jury was influenced by bias, prejudice, or passion or (2) if the damages were contrary to the overwhelming weight of credible evidence." *Id.* (quoting *Stockett v. Classic Manor Builders Inc.*, 226 So. 3d 620, 623 (¶9) (Miss. Ct. App. 2017)).

¶69.    However, "[t]he jury's verdict in a civil case is a finding of fact." *Kirk*, 380 So. 3d at 274 (¶57) (quoting *Edwards v. Ellis*, 478 So. 2d 282, 289 (Miss. 1985)). "Awards fixed by jury determination are not merely advisory and will not under the general rule be set aside unless so unreasonable in amount as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous." *Haynes*, 358 So. 3d at 1090 (¶33) (quoting *Stockett*, 226 So. 3d at 624 (¶12)). Accordingly, "we are not allowed to supplant our judgment for that of the jury unless we conclude that there was insufficient evidence to support the award of damages or that the verdict was the product of bias, passion, or prejudice." *Kirk*, 380 So. 3d at 274 (¶57) (quoting *Gen. Motors Corp. v. Pegues*, 738 So. 2d 746, 755 (¶25) (Miss. Ct. App. 1998)).

¶70.    "Although we recognize that 'the sky is not the limit with regard to jury verdicts,' we

---

[7] *See* Miss. Code Ann. § 11-1-55 ("The supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence").

afford a jury 'broad leeway' when it comes to an award of damages." *APAC Miss. Inc. v. Johnson*, 15 So. 3d 465, 479 (¶38) (Miss. Ct. App. 2009) (quoting *Cade v. Walker*, 771 So. 2d 403, 410 (¶20) (Miss. Ct. App. 2000)); *see also Banks v. Lockhart*, 119 So. 3d 370, 376 (¶24) (Miss. Ct. App. 2013) ("The award of $300,000 in compensatory damages and $50,000 in punitive damages does appear rather substantial," but "this Court cannot say that such an award shocks the conscience, such that remittitur would have been proper"); *see also Cade*, 771 So. 2d at 410 (¶20) (affirming a jury award of "51 times her medical expenses" since "the amount of damages is primarily a concern for the jury").

¶71.    The county court's order on ABL's post-trial motion discussed remittitur thoroughly and included the following discussion:

> In our case, Rowell only sought damages for his past medical expenses and for approximately two years or so of pain and suffering. He did not ask the jury to make an award for future pain and suffering or for lost wages or future disability. By the time Rowell got to trial all medical treatment had ceased and he was able to work full time as a pipe fitter.
> . . . .
> If fact, Rowell's case is unlike any of the reported cases that this judge was able to find when researching the issue of a remittitur and or a new trial on the issue of damages.
> . . . .
> The most significant difference between Rowell's case and all of the reported cases that this Court found was that at the time of the injury and for approximately two years following the injury, Rowell was incarcerated. He was an inmate in the County jail and an MDOC inmate in Rankin County. Therefore, medical treatment was not readily available to Rowell. Although he complained constantly about his shoulder pain, he was only allowed to see a doctor some four months after the initial injury to his shoulder . . . .
> . . . .
> Upon his release from custody, he had no job and no health insurance, which prevented him from seeking medical treatment. When he finally did get back

to work, and could afford to go to the doctor, he sought treatment. However, by that time there just wasn't a lot the doctor could do for him. The injury was too old and *Rowell had basically rehabbed it himself*.

(Emphasis added).

¶72.   The county court also denied a remittitur based in part on our statutes that "limit[] a parties Noneconomic damages to no more than One Million Dollars" and "limit[] the jurisdiction of the County Court to two hundred thousand dollars, exclusive of interest and cost." The court determined, "In this case the verdict of the jury was well within those parameters."

¶73.   Rowell's medical records, which were entered into evidence at trial without objection, reveal that on "02/07/2017," he visited a Dr. Porter in Vicksburg. The doctor's records state Rowell's "chief complaint" was "R shoulder pain." The document provides Dr. Porter's assessment was "Adhesive capsulitis of right shoulder." The doctor's "Discussion Notes" further inform that Rowell "injured his shoulder 3 or 4 months ago. He ended up getting an MRI recently that shows no redness wrote no rotator cuff tears. No glenoid labral tears, but he has since developed adhesive capsulitis from not moving it. I gave him some exercises to do and he is going to come back and see me in a month, to see how he is progressing. [I]f there is any way for him to get physical therapy on the shoulder that would be a great idea." There is also a note to "Return to Office to see [Dr.] Porter . . . on or around 03/07/2017." Rowell would later testify he never received follow-up care from Dr. Porter.

¶74.   Rowell testified that after he was released on parole, he was still suffering from pain

26

in his arm and shoulder. He was eventually able to seek medical treatment from an orthopaedic doctor named Dr. Johansen in March 2019. Dr. Johansen's medical records reflect that Rowell's chief complaint was "R[ight] shoulder pain" and noted, "The patient hit a sheet of ice but this was in 2016," and "since then he states his shoulder has been getting progressively worse." The records also note "pain right shoulder impingement" and "rotator cuff tear right shoulder."

¶75.    Rowell then had a follow-up visit in August 2019, which the records reflect was "for MRI review of the right shoulder." He testified he did not have insurance and could not afford to pursue any further medical treatment.

¶76.    At trial, Rowell advised his only documented special damages were the costs of medical treatment from these two visits to the orthopaedic doctor in 2019. The receipts from these visits totaled $545.00.

¶77.    But this is not the sum total of the damages Rowell claimed in his suit against ABL. Rowell's complaint asserted noneconomic damages for: "pain, suffering and mental anguish to date;" as well as "non-permanent injuries, pain, suffering and mental anguish to date;" and "loss of enjoyment in life and quality of life[.]" He also requested relief of "compensatory damages, including, but not limited to, those for past and future pecuniary *and non-pecuniary losses*, emotional distress, suffering, loss of reputation, humiliation, inconvenience, mental

anguish, loss of enjoyment of life, *and other nonpecuniary losses*[.]" (Emphasis added).[8]

¶78.    As set out in the cases above, noneconomic damages are determined by the jury. Unlike many other negligence-based personal injury cases, Rowell did not have unfettered access to medical resources. He received medical attention almost exclusively at the mercy of the prison's procedures. As established by Rowell, and uncontradicted by ABL, the medical treatment procedures in the prison were restrictive. He was required to fill out a sick call requesting medical service; a nurse initially evaluates inmates; inmates have to see a nurse three times before they can move up the chain of command; the inmates are then sent to a nurse practitioner for evaluation; if the nurse practitioner cannot solve the issue, only then will the inmate see a doctor.

¶79.    Because of the prison's procedures, Rowell was not able to see a doctor until over 3 months after his fall, even with his repeated medical requests. It was at this 3-month mark that he received his first MRI after the injury. He did not receive an MRI until this 3-month mark. During this time, Rowell complained: "My hip and arm is still hurting. I need to see a doctor or get it ex-rayed;" "My right arm is still hurting more & more. I need it ex-rayed;" "I am in so much pain;" "I believe my arm is broke;" "I need something done about my arm. I have [been] compl[ain]ing scence June. (3+ months) **I am** [in] **pain!**"; "My arm is getting

---

[8] "Black's Law Dictionary defines 'pecuniary damages' as 'damages that can be estimated and monetarily compensated' and 'non-pecuniary damages' as 'damages that cannot be measured in money.'" John W. Degravelles, *Supreme Court Charts Course for Maritime Punitive Damages*, 22 U.S.F. Mar. L.J. 123, 145 (2010) (quoting Black's Law Dictionary 418 (8th ed. 2004)).

w[orse], and in more pain then before;" and "I need to talk to my pervider about the seriousness of my shoulder, the pain."

¶80.    About 6 months after his fall, he was taken to a medical specialist for evaluation. Rowell was scheduled for a follow-up appointment with this specialist; however, he would later testify,

> I was supposed to go back and I never did go back. . . . [The prison doctor] asked me why not. I said because he [the specialist] never called for me. And he did tell me he wanted to see me again, but I never did get to see him again. So [the prison doctor] said, . . . "I'm going to put it in there for you to go see him . . . to do a follow-up with you . . . ." And still to this day, I never seen him again. So I don't know what happened with that.

¶81.    ABL argues that "[t]he jury award of $125,000" here "shocks the conscience" (*sic*) because the "special damages submitted to the jury for consideration" were for only "$545.00." According to ABL, the jury returned an excessive award "despite the fact that Mr. Rowell did not have any documented medical treatment for almost eight months after the accident, only had a total of three visits, none of which involved any treatment, and no proof of any injury caused by his fall."

¶82.    Evidence of and compensation for pain and suffering from physical injuries are different from medical bills for injuries. "[T]here are some damages, such as medical expenses and loss of income, which must be proved with reasonable certainty, but there are also some damages, such as pain and suffering, that are not susceptible of proof as to monetary value, and these items must be left to the discretion of the jury as long as the amount thereof, under all of the evidence, is just and reasonable." *Pegues*, 738 So. 2d at 756

29

(¶26) (quoting *Holmes Cnty. Bank & Tr. Co. v. Staple Cotton Co-op.*, 495 So. 2d 447, 451 (Miss. 1986)); *see Circus Circus Miss. Inc. v. Cushing*, 108 So. 3d 980, 990 (¶21) (Miss. Ct. App. 2012) ("[d]ue to the uncertainty of the monetary value placed on pain and suffering and future damages, we have affirmed damages up to fifty-one times the actual damages shown").

¶83. Upon our review of the record, we cannot find the amount of damages awarded by the jury was unjust or unreasonable. Nor can we find the denial of remittitur was an abuse of discretion. Therefore, the county court did not err by denying ABL's request for a new trial.

## CONCLUSION

¶84. For the reasons stated above, we affirm the circuit court's judgment affirming the county court's order denying ABL's post-trial motion for JNOV, a new trial, or, in the alternative, a remittitur.

¶85. **AFFIRMED.**

**BARNES, C.J., WESTBROOKS, McDONALD, LAWRENCE, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. EMFINGER, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON AND WILSON, P.JJ.**

**EMFINGER, J., DISSENTING:**

¶86. Because I would find, under the facts of this case, that Rowell failed to provide expert medical testimony to establish that his shoulder injury and resulting pain were caused by his fall, the jury's verdict should be reversed and the case remanded for entry of judgment in favor of ABL, and I respectfully dissent.

30

¶87.    In *Knox v. Mahalitc*, 105 So. 3d 327, 329 (¶7) (Miss. Ct. App. 2011), this Court

stated:

> In order to prove negligence, a plaintiff must show "duty, breach, causation,
> and damages." *Duckworth v. Warren*, 10 So. 3d 433, 440 (¶23) (Miss. 2009)
> (quoting *Todd v. First Baptist Church of West Point*, 993 So. 2d 827, 829 (¶10)
> (Miss. 2008)). **However, even if a party is negligent, he is not liable to the
> plaintiff unless the negligence is "the proximate cause of the injury."** *Utz
> v. Running & Rolling Trucking, Inc.*, 32 So. 3d 450, 466 (¶41) (Miss. 2010)
> (citing *Jones v. U.S. Fid. & Guar. Co.*, 822 So. 2d 946, 948 (¶7) (Miss. 2002)).
> **"Proximate cause requires the fact finder to find that the negligence was
> both the cause in fact and the legal cause of the damage."** *City of Jackson
> v. Spann*, 4 So. 3d 1029, 1033 (¶11) (Miss. 2009) (citing *Glover v. Jackson
> State Univ.*, 968 So. 2d 1267, 1277 (¶31) (Miss. 2007)).

(Emphasis added). In *Rankin v. Averitt Express Inc.*, 115 So. 3d 874, 879 (¶17) (Miss. Ct.

App. 2013), this Court explained:

> **Unless the case is simple and routine, medical causation must prove the
> disability and the causal connection to employment by use of expert
> testimony**. *Shipp v. Thomas & Betts*, 13 So. 3d 332, 337 (¶21) (Miss. Ct. App.
> 2009). "The causal connection between the claimant's injury and disability
> must be proven with competent medical proof and based upon a reasonable
> degree of medical probability." *Anthony v. Town of Marion*, 90 So. 3d 682,
> 690 (¶28) (Miss. Ct. App. 2012) (quoting *Airtran v. Byrd*, 953 So. 2d 296, 299
> (¶3) (Miss. Ct. App. 2007)).

(Emphasis added). Further, in *Childers v. Illinois Central Railroad Co.*, 281 So. 3d 1175,

1180 (¶7) (Miss. Ct. App. 2019), this Court explained:

> **For example, where an injury is fairly self-evident, such as a car accident
> resulting in a broken limb, the average layman could deduce the resulting
> injury and its cause.** *Id*. (citing *Moody v. Maine Cent. R.R. Co.*, 823 F.2d 693,
> 695-96 (1st Cir. 1987)). The causal link between a cancer diagnosis and
> exposure to harmful toxins, however, often requires the expertise and
> knowledge of a medical expert.

(Emphasis added).

¶88. In the present case, Rowell was the only witness to testify as to his fall and the pain he contends was the result of the fall. His injury, however, was not obvious. While he made some complaints to prison officials concerning pain in his shoulder, he was not seen by a doctor until February 7, 2017, over seven months after his fall. Records introduced at trial show Rowell was seen on that date by Dr. William Porter, who reported that an MRI showed no rotator cuff tears and no glenoid labral tears. Dr. Porter's records note that Rowell had developed "adhesive capsulitis from not moving it." There was no expert medical testimony to explain this condition or to relate it to Rowell's fall. Over two years later, on March 25, 2019, records show that Rowell was seen by Dr. R. Lance Johansen, who noted in his record of that visit that his "[i]mpression" was that Rowell had "pain in his right shoulder with impingement" and "rotator cuff tear right shoulder." Again, however, there was no expert medical testimony to explain these conditions or relate them in any way to Rowell's fall in 2016. To simply produce medical records and invoices to show proximate cause is insufficient, especially where there are no obvious injuries.[9] In *Downs v. Ackerman*, 115 So. 3d 785, 790-91 (¶18) (Miss. 2013), the supreme court stated:

> Even if medical bills are necessarily and reasonably incurred for a particular condition, that fact does not "mandate a finding that those medical bills were incurred as a result of the accident in question." *Herring v. Poirrier*, 797 So.

---

[9] While I agree with the majority that Rowell could testify to pain and suffering, that is not the issue. Rowell failed to meet his burden to prove that the fall was the **proximate cause** of his pain and suffering.

2d 797, 809 (Miss. 2000). Therefore, while Downs's medical bills established a presumption that those bills were reasonable and necessary for the treatment of her injuries, her medical bills were not prima facie evidence that the accident was the proximate cause of Downs's injuries.

¶89.   In *Younger v. Southern*, cited by the majority for a different point, the plaintiff was driving his truck and was struck by a school bus pulling out of a parking lot. *Younger v. Southern*, No. 2022-CA-01228-COA, 2025 WL 1165244, at *1 (¶2) (Miss. Ct. App. Apr. 22, 2025), *pet. for cert. filed* (Miss. Nov. 10, 2025). He had no obvious injuries while at the scene of the accident and declined to be transported by ambulance to a hospital. *See id*. at *1-2 (¶¶2-5). He did, however, have his wife take him to the hospital within hours of the accident. *Id*. at *2 (¶4). He was examined and released without any major complaints. In the weeks and months after the accident, he obtained treatment from several physical therapists and was seen by several doctors. *See id*. at *4 (¶16). None of the medical professionals appeared at trial, but the plaintiff introduced medical records from his visits. *Id*. The plaintiff was the sole witness to testify that the accident caused the pain he experienced and that the treatments he received were made necessary by the accident. *See id*. at *6 (¶20). This Court reversed the damage award for pain and mental anguish and rendered judgment reducing the award for medical expenses to the amount charged for the hospital visit on the day of the accident.  *See id*. at *8 (¶24). This Court stated:

> Under the facts of this case, we find that Southern's testimony alone was not sufficient to support the trial court's finding that his conditions were proximately caused by the accident. In the absence of obvious injuries on the day of the accident, we find that Southern needed expert medical testimony, or at least the testimony of the treating physicians, to explain the medical

33

records, and to establish that the accident was a proximate cause of his need for specific medical treatments (after the day of the accident) and his pain, suffering, and mental anguish after that the accident.

*Id*.

¶90. I would find the same to be true in the present case. Rowell's testimony and the medical records were not sufficient to prove medical causation. I would reverse the jury's verdict and remand the matter to county court for entry of a judgment in favor of ABL.

**CARLTON AND WILSON, P.JJ., JOIN THIS OPINION.**